[No. B064293. Second Dist., Div. One. Oct. 25, 1993.]

FLORENCE FRANKLIN, Plaintiff and Respondent, v.
MARIE ANTOINETTE CONDOMINIUM OWNERS ASSOCIATION,
INC., Defendant and Appellant.

## COUNSEL

Schlegel, Stone & Manning, Michael H. Manning, Brian G. Hummel, Horvitz & Levy, Daniel J. Gonzalez, Richard L. Hasen and Gerald M. Serlin for Defendant and Appellant.

Greenberg, Glusker, Fields, Claman & Machtinger and Jeffrey Spitz for Plaintiff and Respondent.

## OPINION

**ORTEGA, J.**—This appeal concerns an exculpatory clause contained in the declaration of covenants, conditions and restrictions (CC&R's) governing the relationship between an association of condominium homeowners and the condominium owners. If applied to this case, the exculpatory clause will relieve the association of its contractual liability to pay the plaintiff condominium owner for water damage to her unit caused by a central plumbing

leak. We reverse the judgment with directions to enter judgment for the defendant association.

## I

### FACTS AND PROCEDURAL BACKGROUND

The condominium project, known as the Marie Antoinette Tower (the Tower), is a 16-floor residential building on Wilshire Boulevard near Westwood Village in Los Angeles. The Tower was originally built as apartments in 1962, and was converted to condominiums in 1978.

Defendant Marie Antoinette Condominium Owners Association, Inc. (the Association), a nonprofit corporation duly organized and existing under California law (see Civ. Code, § 1363) (unless otherwise indicated, all further statutory references are to the Civil Code), is comprised of all Tower condominium owners. The CC&R's provide that the owners own the Tower's common area as tenants in common. (See §§ 1351, subds. (b) and (f), 1362.) The CC&R's further provide that the Association is responsible for maintaining and repairing the common area, and the owners are responsible for maintaining and repairing their individual units. (See § 1364, subd. (a).)[1]

In 1984, plaintiff Florence Franklin purchased a condominium in the Tower. After painting and remodelling her unit by installing new hardwood floors, crown and base moldings, bathroom fixtures, doors and frames, plaintiff moved into the Tower in March 1985.

The water damage to plaintiff's hardwood floors became apparent in mid-1986 beginning with a small area at the threshold leading from the hallway to the master bedroom. The damage later spread to other parts of the floor.[2]

---

[1]"Unless otherwise provided in the declaration of a common interest development, the association is responsible for repairing, replacing, or maintaining the common areas, other than exclusive use common areas, and the owner of each separate interest is responsible for maintaining that separate interest and any exclusive use common area appurtenant to the separate interest." (§ 1364, subd. (a).)

[2]The damage was first noticed while plaintiff was away on a four-month vacation in mid-1986. During her absence, the daughter of a friend (Anderson) stayed in the condominium. Anderson discovered a leak beneath the sink in the master bedroom bathroom, which she reported to the Tower doorman and had repaired. About six weeks later, Anderson began to notice some raising, swelling or buckling of the floorboards, beginning with the area at the threshold leading from the hallway to the master bedroom. After plaintiff returned from her vacation, the damage began to spread to other parts of the floor.

The moisture underneath the floorboards caused the wood to rise, swell or buckle.[3]

Plaintiff notified the Tower's manager about the water damage to her hardwood floors in mid-1986. The manager told plaintiff the damage was caused by a leak beneath the sink in her master bedroom bathroom and was her sole responsibility. After the manager reported his opinion on plaintiff's claim to the Association's board (the Board), the Board asked the Association's insurer to send out an investigator.[4]

After receiving the insurance investigator's report of "no evidence of [a] central plumbing breakdown," the Board decided "it would be inappropriate to either make an offer to pay [plaintiff's] claim . . . or to have [the Association's] insurance company process" plaintiff's claim.

Plaintiff filed suit against the Association in February 1987, alleging its failure to maintain and repair the central plumbing had caused water damage to her hardwood floors.

During this period, the Association was repairing various leaks in the Tower's plumbing system as they occurred. By about mid-1987, most of the Board members (including plaintiff, who served on the Board from early summer 1985 through August 1987) realized the building's rusting steel pipes needed replacement. Eventually, the Board successfully lobbied a majority of the owners to obtain approval of a special assessment of approximately $20,000 per owner to repipe the Tower's plumbing system and renovate the heating and air conditioning system.[5] The replacement and repairs were completed in 1990.

---

[3]In addition to the floors, plaintiff's complaint listed other areas that were damaged. In November 1986 the interior condominium walls, crown moldings, base moldings, doors and kitchen cabinets began cracking or warping. In December 1986 water began leaking from the heating and air conditioning vents into plaintiff's condominium, which she testified did not receive adequate heating or cooling. The trial court's statement of decision did not, however, mention the damaged walls, moldings, doors, cabinets, leaking vents, and faulty heating and air conditioning. The statement of decision mentioned only the damaged floors. Accordingly, we will limit our discussion in this opinion to the damaged floors.

[4]The CC&R's require the Association to purchase a "blanket policy or policies of fire and casualty insurance with a special form all-risk coverage endorsement for the full insurable replacement cost of the Common Area and the units . . . insuring the Board, the Association, the owner or owners of each unit . . . and their mortagagee(s) . . . against loss due to fire and other casualty customarily insured against by homeowners . . . ."

[5]After the completion of this project in 1990, plaintiff no longer had water leaking into her unit from the heating and air conditioning vents.

This case was tried in July 1991 without a jury on three causes of action: breach of contract, negligence, and nuisance.[6]

The parties presented conflicting expert opinion testimony on causation. The Association's witnesses attributed the water damage to a leak under the sink in plaintiff's master bedroom bathroom. Plaintiff's witnesses, on the other hand, attributed the water damage to a leak in the central plumbing system.

The trial court found the damage was caused by a leak in the central plumbing system. The court concluded the system had deteriorated to the point of constituting a breach of the contractual duty to maintain and repair the common area, but not to the point of constituting a nuisance or establishing negligence on the part of the Association. The court found for plaintiff on her breach of contract claim only. The court entered judgment for plaintiff awarding her damages of $74,015 and costs and attorney fees of $169,315.30. Defendant Association has appealed.

## II

### BREACH OF CONTRACT

■ The Association contends, as it did at trial, that plaintiff's cause of action for breach of contract is barred by the exculpatory clause contained in the CC&R's.

Preliminarily, we note the parties assume the CC&R's formed a contract between the Association and the condominium owners. (See *Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 512 [229 Cal.Rptr. 456, 723 P.2d 573, 59 A.L.R.4th 447], which discussed a condomium owner's breach of contract allegation without expressly deciding whether CC&R's constitute a contract between the association and the owners. See also Sproul & Rosenberry, Advising Cal. Condominium and Homeowners Associations (Cont.Ed.Bar 1991) § 6.43, pp. 295-297, which cites cases in other jurisdictions which have refused to treat CC&R's as contracts between the owners and the association under different fact situations.)

Although the CC&R's require the Association to maintain and repair the common area (see § 1364, subd. (a)), the CC&R's do not require the

---

[6]Plaintiff's causes of action for intentional infliction of emotional distress and breach of fiduciary duty were dismissed after the trial court sustained a demurrer without leave to amend.

Association to reimburse a condominium owner for property damage caused by a central plumbing leak which occurred in the absence of negligence by the Association. The CC&R's contain an exculpatory clause which states in relevant part: "[T]he Association . . . shall [not] be liable for . . . damage to . . . property in the project . . . resulting from . . . water . . . which may leak or flow from outside of any unit or from any part of the building, or from any pipes, drains, conduits, appliances or equipment or from any other place or cause, unless caused by the gross negligence of . . . the Association, its Board, officers, the manager or his staff."[7]

In ascertaining the parties' intent, we are guided by the following principles. "The language of the instrument must govern its interpretation if it is clear and explicit. [Citation.] Generally, the words of a contract are to be understood in their ordinary and popular sense [citations] unless a contrary intent is shown, such as a specialized meaning due to trade custom and practice or a prior course of dealing [citations]. [¶] The interpretation of a written contract is solely a judicial function unless the interpretation turns on the credibility of extrinsic evidence. [Citations.]" (*Appalachian Ins. Co.* v. *McDonnell Douglas Corp.*, *supra*, 214 Cal.App.3d at p. 11.)

On appeal, neither party contends the exculpatory clause is ambiguous or that its interpretation turns on the credibility of extrinsic evidence. Both parties assume the exculpatory clause, if enforced according to its terms, relieves the Association of any contractual liability to pay for property damage to plaintiff's floors caused by a leak in the common plumbing system.

Plaintiff contends the exculpatory clause is unenforceable, however, because it affects the public interest.[8] Plaintiff relies primarily upon *Cohen* v. *Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642 [191 Cal.Rptr. 209], a

---

[7]We do not suggest, nor do the parties, that the exculpatory clause relieves the Association of its duty under another provision of the CC&R's to purchase casualty insurance on behalf of the condominium owners. Even if relieved of its contractual liability to pay for property damage, the Association must still provide insurance for the condominium owners. "A court must view the language in light of the instrument as a whole and not use a 'disjointed, single-paragraph, strict construction approach.' [Citation.] If possible, the court should give effect to every provision. [Citations.] An interpretation which renders part of the instrument to be surplusage should be avoided. [Citations.]" (*Appalachian Ins. Co.* v. *McDonnell Douglas Corp.* (1989) 214 Cal.App.3d 1, 12 [262 Cal.Rptr. 716].)

[8]In *Frances T.* v. *Village Green Owners Assn.*, *supra*, 42 Cal.3d at page 500, footnote 9, the court took "judicial notice of the fact that a rapidly growing share of California's population reside in condominiums, cooperatives and other types of common-interest housing projects. Homeowner associations manage the housing for an estimated 15 percent of the American

suit between homeowners and a homeowners association.[9] In *Cohen*, the court held plaintiffs' cause of action (for breach of the duty to act in good faith and to avoid arbitrary decisions in applying the CC&R's) was not barred by the exculpatory clauses contained in the CC&R's. We quote at length the passages from *Cohen* which plaintiff contends are applicable to this case:

"The law has traditionally viewed with disfavor attempts to secure insulation from one's own negligence or wilful misconduct, and such provisions are strictly construed against the person relying on them, particularly where such person is their author. [Citations.] Here, the Association is the creation and successor of the author, S & S Construction Company, and therefore subject to this rule of strict construction.[10]

population and, for example, as much as 70 percent of the new housing built in Los Angeles and San Diego Counties. [Citation.] Nationally, '[t]hey are growing at a rate of 5,000 a year and represent more than 50 percent of new construction sales in the urban areas. Projects average about 100 units each, so the associations affect some 10 million owners,' [citation]. [H]ousing experts estimate that there already are 15,000 common-interest housing associations in California. While in some projects the maintenance of common areas is truly cooperative, in most of the larger projects control of the common area is delegated or controlled by ruling bodies that do not exercise the members' collective will on a one-person, one-vote basis. [Citation.]"

[9]In *Cohen*, article VII, section 1 of the CC&R's set forth standards by which the association's architectural committee was to approve or deny an individual homeowner's construction or improvement plans. At the same time, however, the CC&R's purported to release the association from its duty to comply with the provisions of article VII, section 1. Moreover, the CC&R's purported to absolve the association, its board, its committees, and its members from liability to any member, homeowner, or the association for " 'any damage, loss or prejudice suffered or claimed on account of any decision, approval or disapproval of plans or specifications (whether or not defective), course of action, act, omission, error, negligence or the like made in good faith within which such Board, committee, or persons reasonably believed to be the scope of their duties.' " (*Cohen* v. *Kite Hill Community Assn.*, supra, 142 Cal.App.3d at p. 650.)

The solid slump stone fence at issue in *Cohen* was approved by the architectural committee despite the neighboring owners' (plaintiffs) objection that the fence would obstruct their view and violate the CC&R's. The CC&R's called for a two-foot slump stone base topped by a three-foot wrought iron fence to preserve the surrounding view. After failing to persuade their neighbor and the association to modify or prevent the construction of the nonconforming fence, the plaintiffs filed suit.

The trial court in *Cohen* sustained the association's demurrer, but the appellate court reversed the judgment of dismissal.

[10]We note section 1370, enacted in 1985 (two years after *Cohen* was decided), provides: "Any . . . declaration . . . for a common interest development shall be *liberally* construed to facilitate the operation of the common interest development, and its provisions shall be presumed to be independent and severable. . . ." (Italics added.)

In criticizing *Cohen*, Sproul and Rosenberry stated: "The authors believe that California courts should recognize that California developments need 30,000-40,000 residents each year

"Furthermore, it is the express statutory policy of this state that '[a]ll contracts which have for their object, directly or indirectly, to exempt any[ ]one from the responsibility for his own fraud[,] or willful injury to [the] person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.' (Civ. Code, § 1668.)

"This public policy applies with added force when the exculpatory provision purports to immunize persons charged with a fiduciary duty from the consequences of betraying their trusts. [Citations.]

"Moreover, the California Supreme Court has evinced a clear policy of enforcing only those exculpatory provisions which do not affect 'the public interest.' (*Tunkl* v. *Regents of the University of California* (1963) 60 Cal.2d 92, 96 . . . .) Factors to be considered in determining whether a business or transaction affects a public interest include: (a) whether the matter is suitable for public regulation; (b) whether the party provides a service of importance to the public; (c) whether the party invoking it possesses a bargaining advantage against any member of the public who seeks such service; (d) and whether one party is particularly subject to the other's control and the risk of his or her carelessness. (*Id.*, at pp. 98-101.)

---

to serve on boards (most of whom serve without compensation), and should therefore not adhere to such a strict interpretation of exculpatory clauses as that taken in *Cohen*. Although exculpatory clauses were not at issue in *Jaffe v Huxley Architecture* (1988) 200 [Cal.App.]3d 1188, 1193, . . . , the court acknowledged that board members are seldom professional managers and that 'the specter of personal liability would serve to greatly discourage active and meaningful participation by those most capable of shaping and directing homeowner activities.' [¶] Courts in other jurisdictions have upheld exculpatory clauses. See *Nido v Ocean Owners' Council* (Va 1989) 378 SE2d 837; *Kelley v Astor Investors, Inc.* (Ill 1985) 478 NE2d 1346; *Kleinman v High Point of Hartsdale I [Condominium]* (Sup Ct 1979) 438 NYS2d 47." (Sproul & Rosenberry, Advising Cal. Condominium and Homeowners Associations, *supra*, § 6.34, p. 280.)

We note that of the three decisions cited by Sproul and Rosenberry, only 'one is similar to our case. *Nido* v. *Ocean Owners' Council* (1989) 237 Va. 664 [378 S.E.2d 837], involved water leakage from the common areas which caused damage to the plaintiff's condominium. The plaintiff filed suit against the condominium owners' council to recover damages under two of the same theories raised here, breach of contract and negligence. As in this case, the owners' council was found to be not negligent. As for the breach of contract cause of action, the owners' council was found to be immune under an exculpatory clause. Section 6.5 of the association's by-laws provided: "The Council shall not be liable for any failure of water supply or other services . . . or for injury or damage to person or property caused by the natural elements . . . or resulting from electricity, water, snow or ice which may leak or flow from any portion of the Common Elements." (*Id.* at p. 838.)

"Applying one or more of these criteria, the courts have invalidated exculpatory clauses invoked by banks (*Hiroshima v. Bank of Italy* (1926) 78 Cal.App. 362 . . . ; *Vilner v. Crocker National Bank* (1979) 89 Cal.App.3d 732 . . .), hospitals (*Tunkl v. Regents of the University of California, supra,* 60 Cal.2d 92; *Westlake Community Hosp. v. Superior Court* (1976) 17 Cal.3d 465 . . .), and apartment complexes (*Henrioulle v. Marin Ventures, Inc.* (1978) 20 Cal.3d 512 . . .).

"For the reasons earlier stated, we view the Association of homeowners as occupying a particularly elevated position of trust because of the many interests it monitors and services it performs. Therefore, we hold that the exculpatory provisions contained in the Declaration constitute no bar to suit against the Association." (*Cohen v. Kite Hill Community Assn., supra,* 142 Cal.App.3d at pp. 654-655.)

Plaintiff contends this case "presents almost an identical situation to that before the court in *Cohen*." The exculpatory clauses in *Cohen*, however, purported to relieve the association of its responsibility to adhere to the architectural standards set forth in the CC&R's. As the court in *Cohen* recognized, the issue there was "whether the exculpatory clauses effectively cancelled out that duty and thereby immunized the Association from suit." (*Cohen v. Kite Hill Community Assn., supra,* 142 Cal.App.3d at p. 654.)

Here, on the other hand, the Association will be required to maintain the common area whether or not it is liable for breach of contract damages in this case. Enforcing the exculpatory clause in this case will not relieve the Association of its statutory duty to maintain and repair the common area. (§ 1364, subd. (a).) Moreover, a condominium owner may enforce the CC&R's under the law of equitable servitudes without resorting to a breach of contract cause of action. (§ 1354; see Sproul & Rosenberry, Advising Cal. Condominium and Homeowners Associations, *supra,* § 6.43, p. 297.)[11]

Although the exculpatory clause purports to provide immunity from negligence liability, that is now a moot issue due to the trial court's finding of

[11]Section 1354 provides: "The covenants and restrictions in the declaration shall be enforceable equitable servitudes, unless unreasonable, and shall inure to the benefit of and bind all owners of separate interests in the development. Unless the declaration states otherwise, these servitudes may be enforced by any owner of a separate interest or by the association, or by both. In any action to enforce the declaration, the prevailing party shall be awarded reasonable attorney's fees and costs."

no negligence. Plaintiff's dire prediction that enforcing the exculpatory clause in this case "would place every condominium owner at the mercy of their homeowners' association, which would be free to disregard its obligations with impunity" is simply unfounded. This is not an action for declaratory relief to establish the extent of the Association's immunity from liability under the exculpatory clause. Accordingly, we need not decide whether the release from negligence liability is valid.[12]

The narrow issue before us is whether the nonnegligent Association may contractually shift the risk of loss to the condominium owner, who may look only to the insurance proceeds for her recovery against the Association.[13]

Although plaintiff disputes the merits of the exculpatory clause, we find this contractual allocation of risk to be reasonable and fair to the condominium owners as a whole. Here, the condominium owners voluntarily agreed to bear the risk of loss and limit their recovery against the nonnegligent Association to that which is recoverable under the insurance policy. Any condominium owner who desires to purchase additional insurance may do so.

By reducing the Association's risk of liability, the condominium owners have reduced their own risk. The condominium owners are, after all, the ones who are assessed to pay for improvements, insurance premiums, liability judgments not covered by insurance, and the like. Plaintiff is only one of many owners who collectively entered into the contract (CC&R's) with the Association. A reasonable and fair reduction of the Association's risk which mutually benefits the condominium owners as a whole does not suddenly become violative of public policy upon the nonnegligent infliction of property damage to an individual unit. While plaintiff may bear the loss in this case, she may benefit in the next. As was pointed out by our Supreme Court, "no public policy opposes private, voluntary transactions in which one party, for a consideration, agrees to shoulder a risk which the law would

---

[12]Section 1370 provides that CC&R's "shall be liberally construed to facilitate the operations of the common interest development, and its provisions shall be presumed to be independent and severable. . . ."

[13]The trial court found the damage was caused by a leak in the central plumbing, which had deteriorated to the point that the Association had breached its contractual duty to maintain and repair the common area. While the Association challenges on appeal the sufficiency of the evidence to support these findings, we do not reach that issue since the findings are not necessary to our decision of whether the Association may contractually shift the risk of loss to the condominium owner.

otherwise have placed upon the other party . . . ." (*Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92, 101 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693].)

In discussing the somewhat related "question of the individual unit owner's tort liability in cases arising in the common areas," Presiding Justice Roth suggested that insurance taken out by the association for the protection of the condominium owners provides "[o]ne practical answer." (*White* v. *Cox* (1971) 17 Cal.App.3d 824, 832 [95 Cal.Rptr. 259, 45 A.L.R.3d 1161] (conc. opn. of Roth, P. J.).) Presiding Justice Roth further reflected: "It might then be argued depending on the terms of the written declaration between unit owners that, at least as between suing and defendant unit owners, the maximum amount of liability of defendant unit owners has been contractually limited to the maximum of the insurance taken out by the association." (*Ibid.*) We believe this sound reasoning carries equal force when applied to the question of the nonnegligent Association's ability to avoid contractual liability for property damage caused by a central plumbing leak.

The Association, unlike commercial or residential landlords in business to make a profit, is a nonprofit corporation. (See Sproul and Rosenberry, Advising Cal. Condominium and Homeowners Associations, *supra*, § 6.4, pp. 250-251.) As the trial court pointed out below in its statement of decision, the Board "was made up of unpaid volunteers from among the owners of condominiums in the building, who despite the strict contractual obligations of the CC&Rs did their conscientious best to attend to the problems and complaints that came to them. To effectuate major and expensive repairs as ultimately transpired with the repiping of the building, the Board of the Association needed the approval of a majority of the condominium owners in the building. To accomplish this critical requirement, they literally had to politic and campaign. These volunteers were not professionals in the skills of building management and maintenance, and their efforts while perhaps less than proficient, are not demonstrative of individual or group negligence."

The Legislature recognized the need to provide immunity under appropriate conditions to the individual volunteer board members who manage residential condominiums. (§ 1365.7.) The exculpatory clause in this case takes the additional reasonable step of providing immunity under appropriate conditions to the Association. We conclude the exculpatory clause does not, as applied to this case, violate public policy.

## DISPOSITION

We reverse the judgment and direct the trial court to enter judgment for the defendant. Defendant is awarded costs on appeal.

Spencer, P. J., and Vogel (Miriam A.), J., concurred.