[No. D050263. Fourth Dist., Div. One. Apr. 4, 2008.]

E. MILES HARVEY, as Trustee, etc., Plaintiff and Appellant, v. THE LANDING HOMEOWNERS ASSOCIATION et al., Defendants and Respondents.

## Counsel

Butz Dunn DeSantis & Bingham and Luke R. Corbett for Plaintiff and Appellant.

Murchison & Cumming, Kenneth H. Moreno and Scott J. Loeding for Defendants and Respondents.

## Opinion

**BENKE, J.**—Plaintiff E. Miles Harvey appeals the judgment under Code of Civil Procedure section 437c for defendants (1) The Landing Homeowners Association, a California nonprofit mutual benefit corporation (LHA), (2) certain members of the board of directors (Board) of LHA, and (3) various residents of The Landing residing on the fourth floor of the condominium development (collectively defendants). Harvey contends the trial court erred when it granted summary judgment for defendants because (a) the Board acted outside the scope of its authority when it determined fourth floor homeowners could exclusively use up to 120 square feet of inaccessible common area attic space, appurtenant to their units, for rough storage; (b) the Board lacked the power to make a material change in the restated declaration of restrictions (CC&R's) for The Landing by allowing fourth floor homeowners to use the attic space common area for storage; and (c) the various resolutions passed by the Board, permitting use of that space for storage, were invalid because the Board vote lacked a disinterested majority.

■ We conclude the Board acted within its authority under the CC&R's, and the undisputed evidence shows it properly exercised its discretion when it determined fourth floor homeowners could use up to 120 square feet of inaccessible attic space common area for storage. We further conclude the actions of the Board were not invalid because directors who owned units on the fourth floor of the project voted in favor of allowing limited exclusive use of the attic space common area. We therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

The Landing is a four-story, 92-unit condominium complex located in Coronado, California. On the fourth floor of The Landing, each of the 23 units has attic space adjacent to the units designated on the condominium plan as common area. The attic space common area is accessible only to the unit adjacent to it.

For many years, several fourth floor homeowners used the vacant attic space for storage. In mid-2002, a homeowner complained to the Board about that use, which prompted the Board to inspect the fourth floor units. Of the 23 units on the fourth floor, the Board discovered 18 of the homeowners were using between 50 and 288 square feet of the common area attic space for storage, with 10 homeowners using in excess of 120 square feet of that space as storage. In addition, one other fourth floor owner had converted a portion of the common area attic space into habitable living space.

After the inspections were completed, Harvey, who was then president of the Board, and two members of The Landing Architectural Review Committee (ARC) prepared a memorandum to the Board with the results of the inspection. The ARC memorandum recognized fourth floor homeowners had been using the attic space common area for at least 15 years, with many of these homeowners improving the space by adding features such as wallboard, lights, flooring, carpeting, closets, shelves and doors. The memorandum also recognized the homeowners' use of the attic space was governed by article IV, section 12 of the CC&R's, which provides: "The Board shall have the right to allow an Owner to exclusively use portions of the otherwise nonexclusive Common Area, provided that such portions of the Common Area are nominal in area and adjacent to the Owner's Exclusive Use Area(s) or Living Unit, and, provided further, that such use does not unreasonably interfere with any other Owner's use or enjoyment of the Project."

The ARC memorandum found the use of the attic space common area as storage by the fourth floor homeowners did not interfere with any other owner's use or enjoyment of the project and, with one exception, the memorandum concluded the homeowners' use of that space was "nominal" within the meaning of section 12 of the CC&R's. The ARC memorandum concluded by making several recommendations, including having the LHA enter into a license agreement with each of the fourth floor homeowners using the attic space common area.

The memorandum outlined the proposed terms of the license agreement, including, among other things, requiring the fourth floor homeowners to obtain insurance to cover their use of the attic space, preventing additional

modifications or improvements to the space without written approval from the Board and imposing a one-time assessment of $350 to cover the costs and fees associated with the drafting and recording of the license agreement.

Harvey decided to meet with legal counsel regarding the fourth floor homeowners' use of the attic space common area. Among other things, legal counsel opined the LHA lacked authority to "grant the encroaching owners the 'right' to continue their use of the common area" because "using an attic for storage is not a nominal use." Based on legal counsel's report, at the next Board meeting Harvey requested the Board to issue notices of violation under the CC&R's to the 18 fourth floor homeowners using the attic space common area. When the Board refused, Harvey immediately resigned as president of the LHA, although he remained a director on the Board.

The City of Coronado (City) became involved in the matter when, in response to a complaint by a disgruntled homeowner regarding the continued use of the attic space common area, it issued to the Board a notice of violation under the California Building Code. Several Board members, including Harvey, met with two building inspectors for the City. The inspectors advised the Board the attic space could be used for storage, but not living space. The Board agreed to provide monthly updates to the City regarding the Board's progress in mitigating all aspects of the notice of violation.

At its next meeting, the Board voted four to one in support of a motion finding a violation of the CC&R's and the building codes by the fourth floor homeowners using the attic space common area. During the meeting, the Board recognized its authority under the CC&R's to permit a "homeowner to use a 'nominal area' of the common area provided it is adjacent to [the owner's] unit and such use would not interfere with any one else's use." By the same vote in a renewed motion, the Board purportedly decided (1) 120 square feet or less of the attic space common area could be used for "rough storage (example: boxes, Christmas decorations, luggage, etc.)"; (2) the homeowners would have to ask the Board for "permission" to use the 120 square feet for storage; and (3) this "resolution would also apply to storage space in the pillars that are located in the entrance to front patios." The Board also agreed to hold a workshop for homeowners to "discuss ideas to organize the restoration of the units that have violations."

As it turns out, the average size of the fourth floor living units is about 2,250 square feet. The Landing has approximately 265,479 square feet, which includes approximately 80,000 square feet of common area. The total area approved for attic storage for all fourth floor units combined is 2,760 square feet (e.g., 23 units x 120 square feet), or a little more than 1 percent of the total building area, or approximately 3.5 percent of the total common area.

The Board issued notices of violation to the fourth floor homeowners, telling them their use of the attic common area violated the CC&R's and the California Building Code, directing them to restore the attic space to its original condition and advising them they could make a formal request to the Board for permission to use up to 120 square feet of common area for rough storage under certain conditions. In response to the notices of violation, several homeowners retained legal counsel who claimed those owners had obtained irrevocable rights to use the attic space that could not be disturbed by the Board.

To effectuate the Board's resolution regarding the attic space common area, and to avoid litigation with the fourth floor homeowners, the Board prepared a standard "permission form" to be signed by those homeowners. Among other provisions, the form provided that the homeowner could use no more than 120 square feet of common area for rough storage only, that use of that space was subject to all provisions of The Landing bylaws, the CC&R's and governmental laws, rules and regulations, and that the Board reserved the right to terminate its approval of such use "for cause." In 2003 the Board unanimously approved the "permission form," after myriad revisions, which included three votes by homeowners who did not live on the fourth floor.

The Board also took steps to ensure the LHA's insurance coverage would not be affected by the fourth floor homeowners' use of the attic space common area. The Board consulted the LHA's insurance broker, who determined the "use of the fourth-floor common area attic space in The Landing for storage purposes has not impacted The Landing insurance coverage . . . and has not jeopardized the insurability of The Landing premises." The Board also required each fourth floor homeowner seeking to use the attic space to obtain liability insurance coverage of $1 million.

The City continued to conduct periodic inspections of the fourth floor units to ensure full compliance with applicable laws and regulations. After an inspection in mid-2004, the City found no unit with storage exceeding 120 square feet, and further concluded the units in question were "in compliance with the Building and Fire Codes." The City conducted another inspection of the subject units in late 2005 to ensure fire code compliance. The City's report stated "[a]ll units that had storage were within the maximum allow-[ance] of 120 square feet." The report did note, however, some minor noncompliance items, and asked the LHA to contact the City when they were corrected.

Harvey requested the Board to call a special meeting of the members of the LHA after the Board in mid-2005 amended the rules and regulations of the LHA to set forth the common areas determined by the Board to be appropriate for storage use. Under the rule change, residents of The Landing could not

store property in the common area other than "in the garage storage lockers, or in cabinets installed in the pillars of entry patios, or in the attics of fourth-floor living units to the extent permitted by the Board . . . ." The homeowners approved the rule change by a 56-to-7 vote.

The Board passed a resolution in 2006 transferring to the fourth floor owners the "exclusive right to use the common area attic space in that owner's unit," as allowed under newly enacted Civil Code section 1363.07, subdivision (a)(3)(E). The Board's resolution provided:

"(a) all fourth floor common area attic space is accessible only from the inside of a condominium;

"(b) all fourth floor common area attic space is freely accessible only by the owner of the unit in which . . . it is located;

"(c) all fourth floor common area attic space is inaccessible to owners other than the owner of the unit in which it is located;

"(d) all fourth floor common area attic space is of no general use to the membership at large, but only to the owner of the unit in which it is located; and

"(e) the maintenance and management of fourth floor common area attic space is a burden to the [LHA] because such space is located inside of the condominium, is generally inaccessible to the membership, and is of little use or benefit to the [LHA]."

Harvey filed a lawsuit against defendants alleging causes of action for trespass, breach of fiduciary duty and injunctive relief. Defendants moved for summary judgment. The trial court granted the motion, finding the language of the CC&R's "grants the Board broad authority and discretion to determine whether to allow an owner to exclusively use portions of the common area and this necessarily includes determining what portions are 'nominal in area.' " The court found the Board acted within the scope of authority given to it under article II, section 2 of the CC&R's "when it exercised its discretion in interpreting . . . [section] 12 of the CC&R's and its application to requests from homeowners to use their attic space." The court deferred to the Board's presumed expertise on the use of the attic space common area, based on undisputed evidence showing the "Board conducted a reasonable investigation, in good faith and with regards for the best interests of the community association and its members and exercised discretion within the scope of its authority." The court also ruled directors who voted in favor of allowing limited use of the attic space common area had no conflict of

interest with the LHA merely because they owned units on the fourth floor of the project, and, in any event, the vote of all the homeowners overcame any such potential conflict.

Finally, the court concluded Harvey's trespass claim failed because the attic space common area was being used by the fourth floor homeowners with the Board's express permission. Because no causes of action remained against defendants, the court concluded Harvey was not entitled to injunctive relief. In a separate hearing, the court awarded defendants costs of suit in the amount of $10,220.46, and attorney fees in the amount of $116,794.30.[1]

I

## DISCUSSION

### A. *Applicable Law and Standard of Review*

■ CC&R's are interpreted according to the usual rules for the interpretation of contracts generally, with a view toward enforcing the reasonable intent of the parties. (*Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 380–381 [33 Cal.Rptr.2d 63, 878 P.2d 1275] (*Nahrstedt*); *14859 Moorpark Homeowner's Assn. v. VRT Corp.* (1998) 63 Cal.App.4th 1396, 1410 [74 Cal.Rptr.2d 712].) Where, as here, the trial court's interpretation of the CC&R's does not turn on the credibility of extrinsic evidence, we independently interpret the meaning of the written instrument. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865–866 [44 Cal.Rptr. 767, 402 P.2d 839].)

■ The language of the CC&R's governs if it is clear and explicit, and we interpret the words in their ordinary and popular sense unless a contrary intent is shown. (*Franklin v. Marie Antoinette Condominium Owners Assn.* (1993) 19 Cal.App.4th 824, 829 [23 Cal.Rptr.2d 744]; see also Civ. Code, § 1644.)[2] The parties' intent is to be ascertained from the writing alone if possible. (*WYDA Associates v. Merner* (1996) 42 Cal.App.4th 1702, 1709 [50 Cal.Rptr.2d 323].) If an instrument is capable of two different reasonable interpretations, the instrument is ambiguous. (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 798 [79 Cal.Rptr.2d 273].) In that instance, we interpret the CC&R's to make them lawful, operative, definite, reasonable and capable

---

[1] Harvey has not appealed the award of costs and attorney fees in favor of defendants.

[2] Civil Code section 1644 provides: "The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed."

of being carried into effect, and must avoid an interpretation that would make them harsh, unjust or inequitable. (Civ. Code, § 1643;[3] see also *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 961 [135 Cal.Rptr.2d 505].)

## B. *The CC&R's*

The issue here concerns the interpretation of the LHA CC&R's, including the language "nominal in area" in article IV, section 12 in connection with an owner's exclusive use of the attic space common area.

Article II, section 2 of the CC&R's provides in part: "[T]he activities and affairs of the [LHA] shall be managed and all corporate powers shall be exercised by and under the ultimate direction of the Board. [¶] Except as may be otherwise provided herein, the [LHA] acting through the Board and officers shall have the sole and exclusive right and duty to manage, operate, control, repair, replace or restore all of the Common Area or any portion thereof, together with the improvements . . . ."

Article II, section 3 of the CC&R's provides in part: "The Board shall have the right to adopt reasonable rules and regulations not inconsistent with the provisions contained in [these CC&R's], and to amend the same from time to time relating to the use of the Common Area and the recreational and other facilities situated thereon by Owners and by their lessees or invitees . . . ."

Article IV, section 11 of the CC&R's provides in part: "No part of the Common Area shall be obstructed so as to interfere with its use for the purposes herein above permitted, nor shall any part of the Common Area be used for storage purposes (except as incidental to one of such permitted uses, or for storage of maintenance equipment used exclusively to maintain the Common Area *or in storage areas designated by the Board*)." (Italics added.)

As noted above, article IV, section 12 of the CC&R's gives the Board authority to allow an owner to use exclusively common area provided such use is "nominal in area" and adjacent to the owner's exclusive use area or living unit, and "provided further, that such use does not unreasonably interfere with any other Owner's use or enjoyment of the Project."

The CC&R's make clear the Board has the "sole and exclusive" right to "manage" the common area (art. II, § 2); to "adopt reasonable rules and

---

[3] Civil Code section 1643 provides: "A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties."

regulations not inconsistent with the provisions contained in [the CC&R's]" relating to that use (art. II, § 3); to designate portions of the common area as "storage areas" (art. IV, § 11); and to authorize it to allow an owner to use exclusively portions of the common area "nominal in area" adjacent to the owner's unit, provided such use "does not unreasonably interfere with any other owner's use or enjoyment of the project"[4] (art. IV, § 12).

C. *The Rule of Judicial Deference Applies to the Board's Decision Allowing Fourth Floor Homeowners to Use up to 120 Square Feet of Inaccessible Attic Space Common Area for Rough Storage*

Harvey contends the grant of summary judgment was improper because the Board "had no discretion to overrule or modify the mandate of Art. IV, § 11 that the common area shall not be used for storage." Harvey relies on *Nahrstedt, supra,* 8 Cal.4th 361, to support his position.

In *Nahrstedt,* the Supreme Court addressed the validity of a pet restriction under Civil Code section 1354, subdivision (a) contained in the CC&R's prohibiting residents from keeping all animals (including cats and dogs) in their units except " 'domestic fish and birds.' " (*Nahrstedt, supra,* 8 Cal.4th at p. 369, fn. 3.) Under Civil Code section 1354, subdivision (a), use restrictions in CC&R's are "enforceable equitable servitudes, unless unreasonable . . . ." The *Nahrstedt* court concluded Civil Code section 1354's presumption of reasonableness could only be overcome if the party challenging the restriction could prove the restriction: (1) "violates public policy"; (2) "bears no [reasonable] relationship to the protection, preservation, operation or purpose of the affected land"; or (3) "otherwise imposes burdens on the affected land that are so disproportionate to the restriction's beneficial effects that the restriction should not be enforced." (*Nahrstedt, supra,* 8 Cal.4th at pp. 380–382.) Applying that standard to the facts before it, the court in *Nahrstedt* held a complete ban on animals was not unreasonable and was therefore enforceable under Civil Code section 1354. (*Nahrstedt, supra,* 8 Cal.4th at p. 386.)

Harvey further argues the trial court erred when it relied on the other "leading Supreme Court case[] concerning condominium homeowner associations," *Lamden v. La Jolla Shores Clubdominion Homeowners Assn.* (1999) 21 Cal.4th 249 [87 Cal.Rptr.2d 237, 980 P.2d 940] (*Lamden*). There, an owner sued the condominium community association for injunctive and declaratory relief, claiming the board of directors of the community association caused her unit to decrease in value because of the board's decision to spot-treat

---

[4] Because it is undisputed the attic space common area is accessible only to the unit adjacent to that area, there is no dispute here whether the fourth floor homeowners' use of the attic space common area "unreasonably interfere[s] with any other owner's use or enjoyment of the Project."

rather than fumigate plaintiff's unit for termite infestation. (*Id.* at p. 253.) In affirming the board's action, the court concluded, "[w]here a duly constituted community association board, upon reasonable investigation, in good faith and with regard for the best interests of the community association and its members, exercises discretion within the scope of its authority under relevant statutes, covenants and restrictions to select among means for discharging an obligation to maintain and repair a development's common areas, courts should defer to the board's authority and presumed expertise." (*Ibid.*)

The *Lamden* court thus adopted a "rule of judicial deference to community association board decisionmaking," which "affords homeowners, community associations, courts and advocates a clear standard for judicial review of discretionary economic decisions by community association boards, mandating a degree of deference to the latter's business judgments sufficient to discourage meritless litigation, yet at the same time without either eviscerating the long-established duty to guard against unreasonable risks to residents' personal safety owed by associations that 'function as a landlord in maintaining the common areas' [citation] or modifying the enforceability of a common interest development's CC&R's [citations]." (*Lamden, supra,* 21 Cal.4th at pp. 253, 270.)

Harvey contends the trial court here erred when it relied on *Lamden,* and not *Nahrstedt,* asserting *Lamden* is distinguishable from the present case because the issue in *Lamden* involved the court's review of a discretionary matter—maintenance and repair of a common area in connection with termite control—whereas the issue here involves the "enforcement of the plain language of the governing documents." Harvey thus argues "*Lamden* does not provide defendants support for their contention that the board of directors [of the LHA] had authority and discretion to override the prohibition in the CC&R's against using common area for storage . . . . Lacking that discretion, defendants' evidence regarding the reasonableness of their investigation, and the fairness of their decision to authorize the use of up to 120 square feet of the common area for storage, is beside the point."

The CC&R's do not, however, provide a blanket prohibition against the use of common area for storage, as Harvey suggests. Section 11 of article IV expressly allows the Board to designate storage areas in the common area. Section 12 of article IV further gives the Board the authority and discretion to allow an owner to use exclusively the common area provided certain conditions are met, including the conditions the use be "nominal" and the use not "unreasonably interfere with any other Owner's use or enjoyment of the Project." The CC&R's further grant the Board the exclusive right to manage, operate and control the common areas of the condominium development, providing additional support for the Board's decision to interpret the CC&R's

to allow up to 120 square feet of attic space common area to be used as storage area. (See art. II, §§ 2, 3.)

Unlike the situation in *Nahrstedt* where the challenged provision in the CC&R's did not afford the board of the community association with any discretion (e.g., prohibiting all animals except "domestic fish and birds"), here the challenged provisions (art. IV, §§ 11, 12) provide the Board with the authority and discretion to allow fourth floor homeowners to use, under certain conditions, portions of the common area for rough storage. We thus conclude *Lamden,* and not *Nahrstedt,* governs here.[5]

Under the "rule of judicial deference" adopted by the court in *Lamden*, we defer to the Board's authority and presumed expertise regarding its sole and exclusive right to maintain, control and manage the common areas when it granted the fourth floor homeowners the right, under certain conditions, to use up to 120 square feet of inaccessible attic space common area for rough storage.[6] The undisputed evidence in the record shows the Board conducted an investigation in 2002 regarding homeowners' use of the fourth floor attic space, which had been ongoing for approximately 15 years; met with officials from the City to ensure the use of the attic space complied with building codes; consulted its insurance broker, who determined the "use of the fourth floor common area attic space in The Landing for storage purposes has not impacted The Landing insurance coverage, has not increased the premiums for The Landing condominium policy, and has not jeopardized the insurability

---

[5] In *Haley v. Casa Del Rey Homeowners Assn.* (2007) 153 Cal.App.4th 863, 875 [63 Cal.Rptr.3d 514], this court applied *Lamden*'s rule of judicial deference to community board decisionmaking not involving "ordinary maintenance decisions," observing *Lamden* "also reasonably stands for the proposition that the [community association] had discretion to select among means for remedying violations of the CC&R's without resorting to expensive and time-consuming litigation . . . ." Although the instant case, like *Haley*, also does not involve a per se maintenance decision, we nonetheless conclude the reasoning of *Lamden* applies here as well, where the evidence shows the Board, after undertaking a reasonable investigation and acting in the best interests of the LHA, made a "detailed and peculiar economic decision[]" allowing fourth floor homeowners to use up to 120 square feet of inaccessible attic space common area for rough storage. (*Lamden, supra,* 21 Cal.4th at p. 271; see also *Nahrstedt, supra,* 8 Cal.4th at p. 374 ["[g]enerally, courts will uphold decisions made by the governing board of an owners association so long as they represent good faith efforts to further the purposes of the common interest development, are consistent with the development's governing documents, and comply with public policy"].)

[6] Although, under *Lamden*, we defer to the Board's authority and expertise regarding the "nominal" use of the common area for storage, we note the total area approved for attic storage for all fourth floor units combined is 2,760 square feet (e.g., 23 units x 120 square feet), or a little more than 1 percent of the 265,479 total building area, or approximately 3.5 percent of the approximately 80,000 total square feet common area. As a matter of contract interpretation under our independent standard of review, we have little difficulty concluding the use for storage of up to 120 square feet of inaccessible attic space constitutes a "nominal" use of the common area within the meaning of article IV, section 12.

of The Landing premises"; agreed to conduct a "workshop" for homeowners to "discuss ideas to organize the restoration of the units that have violations"; prepared and revised a standard "permission form" signed by each fourth floor homeowner to ensure compliance with all provisions of The Landing bylaws, the CC&R's and governmental laws, rules and regulations; required each fourth floor homeowner seeking to use the attic space to obtain liability insurance coverage of $1 million; took steps to correct some minor noncompliance items discovered by the City in 2005 during the City's annual inspection of the subject units to ensure fire code compliance; called a special election of all owners of The Landing to determine whether the Board should permit homeowners to use the fourth floor attic space common area for rough storage; and passed a resolution in 2006 transferring to the fourth floor owners the "exclusive right to use the common area attic space in that owner's unit," as purportedly allowed under newly enacted Civil Code section 1363.07, subdivision (a)(3)(E).

This undisputed evidence shows the Board, "upon reasonable investigation, in good faith and with regard for the best interests of the community association and its members," properly exercised its discretion within the scope of the CC&R's when it determined the fourth floor homeowners could use exclusively up to 120 square feet of inaccessible attic space common area as rough storage.[7]

D. *Summary Judgment Was Properly Granted on Harvey's Fourth Cause of Action for Breach of Fiduciary Duty Against the Fourth Floor Directors*

■ Breach of duty is usually a fact issue for the jury. (*Lysick v. Walcom* (1968) 258 Cal.App.2d 136, 150 [65 Cal.Rptr. 406].) Breach may be resolved as a matter of law, however, if the circumstances do not permit a reasonable doubt as to whether the defendant's conduct violates the degree of care exacted of him or her. (*Ibid.*)

Harvey contends summary judgment was improper as to his fourth cause of action for breach of fiduciary duty against certain interested directors

---

[7] Because we conclude the Board acted within its authority under the CC&R's and defer, based on the undisputed evidence in the record, to the Board's economic decision to allow the homeowners to make limited or "nominal" use of the inaccessible fourth floor attic space, we further conclude summary judgment was properly granted on Harvey's first cause of action for trespass against the defendant homeowners. (See *Civic Western Corp. v. Zila Industries, Inc.* (1977) 66 Cal.App.3d 1, 16–17 [135 Cal.Rptr. 915] ["Where there is a consensual entry [on the property of another], there is no [trespass], because lack of consent is an element of the wrong."].) For similar reasons, Harvey's fifth cause of action for injunctive relief, which seeks to enjoin the fourth floor homeowners from using the attic space common area, was also properly disposed of on summary judgment.

because a triable issue of fact exists regarding whether those directors breached that duty to the LHA. Harvey argues the resolutions passed by the Board in 2002, 2003, 2004, 2005 and 2006, authorizing the limited or "nominal" use for storage of inaccessible fourth floor attic space in the common area, were invalid under Corporations Code section 7233 because "[i]n each instance the resolution failed to get the required three votes for adoption unless the votes of directors owning a unit on the fourth floor were counted." To support this contention, Harvey asserts a trier of fact "could easily find defendants' actions in authorizing the use of the attic space for storage were a thinly veiled maneuver to get themselves a valuable asset."

■ However, under Corporations Code section 7233, subdivision (a)(3), a director of a nonprofit mutual benefit corporation may enter into a contract or transaction with the corporation if "the person asserting the validity of the contract or transaction sustains the burden of proving that the contract or transaction was just and reasonable as to the corporation at the time it was authorized, approved or ratified."[8] Courts have interpreted the phrase "authorized, approved or ratified" in the nearly identical provision applicable to general corporation law (Corp. Code, § 310, subd. (a)(3))[9] to address the situation where board approval was based on a vote by an interested director (e.g., here, directors who voted in favor of allowing the attic space to be used for rough storage). (*Sammis v. Stafford* (1996) 48 Cal.App.4th 1935, 1943 [56 Cal.Rptr.2d 589] (*Sammis*).) "If [the] phrase 'authorized, approved or ratified' was construed to mean only those approvals made without the interested director's vote, then [Corporations Code section 7233, subdivision (a)(3)]

---

[8] Corporations Code section 7233 provides: "(a) No contract or other transaction between a corporation and one or more of its directors, or between a corporation and any domestic or foreign corporation, firm or association in which one or more of its directors has a material financial interest, is either void or voidable because such director or directors or such other corporation, business corporation, firm or association are parties or because such director or directors are present at the meeting of the board or a committee thereof which authorizes, approves or ratifies the contract or transaction, if: [¶] (1) The material facts as to the transaction and as to such director's interest are fully disclosed or known to the members and such contract or transaction is approved by the members (Section 5034) in good faith, with any membership owned by any interested director not being entitled to vote thereon; [¶] (2) The material facts as to the transaction and as to such director's interest are fully disclosed or known to the board or committee, and the board or committee authorizes, approves or ratifies the contract or transaction in good faith by a vote sufficient without counting the vote of the interested director or directors and the contract or transaction is just and reasonable as to the corporation at the time it is authorized, approved or ratified; or [¶] (3) As to contracts or transactions not approved as provided in paragraph (1) or (2) of this subdivision, the person asserting the validity of the contract or transaction sustains the burden of proving that the contract or transaction was just and reasonable as to the corporation at the time it was authorized, approved or ratified."

[9] Indeed, the general corporation law is the source of the nonprofit corporation law. (See *Frances T. v. Village Green Owners Assn.* (1986) 42 Cal.3d 490, 525 [229 Cal.Rptr. 456, 723 P.2d 573].)

would be unnecessary. ■ Section [7233, subdivision (a)(2)] and section [7233, subdivision (a)(3)] both permit interested director transactions where the board of directors approves the transaction. The sections differ, however, depending on whether the approval was obtained with or without the interested director's vote and whether there was full disclosure. Where a *dis*interested majority approves the transactions and there was full disclosure, [section 7233, subdivision (a)(2)] applies, and the burden of proof is on the person challenging the transaction. [Citation.] Where, however, the approval was not obtained from a disinterested board vote, section [7233, subdivision (a)(3)] applies and requires the person seeking to uphold the transaction to prove it was 'just and reasonable' to the corporation." (*Ibid.*)

■ We conclude no conflict of interest existed here. As a threshold matter, there is no evidence in the record to support Harvey's argument the fourth floor directors obtained a "material financial interest," as required under Corporations Code section 7233, subdivision (a), when they voted in favor of allowing the attic space common area to be used for storage.[10] (See *In re Hochberg* (1970) 2 Cal.3d 870, 875 [87 Cal.Rptr. 681, 471 P.2d 1] [" 'It is elementary that the function of an appellate court, in reviewing a trial court judgment on direct appeal, is limited to a consideration of matters contained in the record of trial proceedings, and that "[m]atters not presented by the record cannot be considered on the suggestion of counsel in the briefs." ' "].)

Moreover, aside from whether the fourth floor directors obtained a "material financial benefit" under Corporations Code section 7233, subdivision (a), we nonetheless conclude subdivision (a)(2) and (3) apply to validate the Board resolutions challenged by Harvey approving the use of the fourth floor attic space common area. Under subdivision (a)(2) of Corporations Code section 7233, where a *dis*interested majority approves the contract or transaction and there is full disclosure, the action of the board of the mutual benefit corporation is valid. Here, the evidence is undisputed that in May 2003 the Board voted five to zero, which included three votes by directors who did not own a unit on the fourth floor, to approve the "permission form" adopted by

---

[10] The term "material financial interest" is not defined in the code. However, courts generally find such an interest when a person has an expectation of pecuniary gain. (See, e.g., *Michael v. Aetna Life & Casualty Ins. Co.* (2001) 88 Cal.App.4th 925, 942–943 [106 Cal.Rptr.2d 240].) Harvey claims use of the attic space common area for storage is a "valuable asset," but this is not the test under Corporations Code section 7233, subdivision (a). Moreover, several of the directors of the LHA who reside on the fourth floor may question whether their use of the common area attic space is a "valuable asset," particularly after being named by Harvey as defendants in this lawsuit.

the Board setting forth the terms and conditions of the fourth floor homeowners' use of the fourth floor attic space common area for storage. The permission form expressly stated the homeowners could use up to 120 square feet of that space.[11]

In light of the undisputed evidence in the record, and our deference to the Board's exercise of discretion in determining the use of up to 120 square feet of fourth floor attic space for storage constitutes a "nominal" use, we have little difficulty concluding the material facts of the transaction were fully disclosed and/or known to the Board at the May 2003 meeting, when it approved the "permission form" allowing the use of that inaccessible common area. We further conclude this same undisputed evidence shows the transaction to be "just and reasonable" to the LHA, and Harvey has not met his burden to show otherwise.

Finally, we conclude the actions of the Board in connection with this storage issue were also valid under subdivision (a)(3) of Corporations Code section 7233, which applies to a vote of interested directors. (*Sammis, supra,* 48 Cal.App.4th at p. 1943 [subd. (a)(3) governs when approval was not obtained from a disinterested board vote].) According to Harvey, when the Board voted at meetings on December 17, 2002, April 16, 2003, July 15, 2003, April 21, 2004, July 20, 2005, and January 1, 2006, to authorize the "nominal" use of the fourth floor attic space common area for rough storage, it lacked a disinterested majority. The burden then shifted to the person seeking to uphold the validity of the transaction to prove it was "just and reasonable as to the corporation" at the time it was "authorized, approved or ratified." (Corp. Code, § 7233, subd. (a)(3); see *Sammis, supra,* 48 Cal.App.4th at p. 1943.) Based on the undisputed evidence, we conclude defendants met their burden to show the "transaction" between the interested directors and the LHA was "just and reasonable" to the LHA when the Board voted at the various meetings to approve the "nominal" use of the fourth floor attic space for rough storage, and Harvey has adduced no evidence to show otherwise.

---

[11] It is not entirely clear from the record which of the various drafts, if any, of the permission form included in the record ultimately became the "final" form approved and used by the Board. (See, e.g., exhibits R, S, T, U & V.) For present purposes, however, it matters little, inasmuch as in each of the drafts the Board specifically noted the homeowners could use for rough storage up to 120 square feet of the fourth floor attic space appurtenant to their units.

## DISPOSITION

The judgment is affirmed. Defendants are entitled to their costs on appeal.

McConnell, P. J., and McIntyre, J., concurred.