Filed 9/15/25  Glen Properties Corp. v. KCN A Management, LLC CA4/3
Opinion following rehearing

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| OLEN PROPERTIES CORP., | |
| Plaintiff and Appellant, | G062851 |
| v. | (Super. Ct. No. 30-2021-01190139) |
| KCN A MANAGEMENT, LLC et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from an appealable order of the Superior Court of Orange County, William D. Claster, Judge. Affirmed in part, reversed in part, and remanded.

Palmieri, Hennessey & Leifer, Michael H. Leifer, Michael I. Kehoe and Erin Balsara Naderi for Plaintiff and Appellant Olen Properties Corporation.

Scheppach Bauer, Thomas E. Gibbs and Brian R. Bauer for Defendant and Appellant KCN A Management, LLC.

Paul Hastings, Navi Dhillon, Sean D. Unger; Holland & Knight, David A. Robinson, Andrew M. Cummings and Krystal Anderson for Defendant and Appellant TPG Acquisition, LLC.

*     *     *

INTRODUCTION

The Koll Center Newport (the Koll Center) is a master-planned, mixed-use development area adjacent to John Wayne Airport in Newport Beach. The Koll Center is subject to a Declaration of Covenants, Conditions and Restrictions (the CC&Rs) that was drafted in 1972 by the original Declarant, Koll Center Newport, L.P. (Koll Center Newport), and recorded in 1973 over the vacant land which then constituted the Koll Center. Nearly every issue presented is based upon and requires interpretation of at least one section of the CC&Rs.

Over the decades, the Koll Center was developed. Plaintiff and appellant Olen Properties Corporation (Olen) became the owner of a four-story office building at the Koll Center. Defendant and appellant KCN A Management, LLC (KCN) became the successor Declarant under the CC&Rs.

In July 2022, KCN approved a proposal by defendant and appellant TPG Acquisition, LLC (TPG) for the construction of a five-story, 312-unit apartment complex, a dedicated one-acre public park, and a four-level freestanding parking structure at the Koll Center. We refer to this proposed construction project as the TPG Project. The proposed apartment complex and park were adjacent to the building owned by Olen and bordered the building on two sides.

Olen brought this lawsuit alleging the TPG Project and KCN's approval of it violated several provisions of the CC&Rs.

2

Following a bench trial on Olen's cause of action for declaratory relief, the trial court issued a 35-page statement of decision. Based on two of Olen's claims, the court granted an injunction enjoining construction of the TPG Project until two conditions were met.

Nobody was entirely satisfied with the trial court's decision. Olen, KCN, and TPG each appealed.

We affirm the order granting the injunction. On the various issues regarding interpretation of the CC&Rs, we agree with Olen on some and agree with KCN and TPG on others. Our conclusions, however, do not affect the issuance of the injunction but add to the grounds for an injunction. We therefore remand to the trial court to modify the injunction in accordance with the disposition of this Opinion. On KCN's appeal, we conclude KCN owes fiduciary duties to Olen. On TPG's appeal, we conclude the trial court did not err by finding that TPG pressured KCN and that TPG breached the CC&Rs. Finally, we conclude Olen's first cause of action against TPG should be reinstated with leave to amend.

Although this appeal presents many issues and requires extensive analysis, our decision can be expressed simply by that well-known saying from Maine, "you can't get there from here." You cannot get to the TPG Project from the CC&Rs: The CC&Rs as they are drafted do not permit the TPG Project to go forward in its current plan.

FACTS

I.

THE KOLL CENTER AND THE CC&RS

The Koll Center is a mixed-use development area, adjacent to John Wayne Airport, in the City of Newport Beach (the City). The Koll Center is about 117 acres in size and is bounded by Campus Drive,

3

MacArthur Boulevard, and Jamboree Road. The Koll Center is subject to the Planned Community Development Standards (the Development Standards) adopted by the City in 1972. The stated purposes of the Development Standards were "to provide comprehensive zoning" and "[en]sure development consistent with the master plan concept."

The Koll Center is also subject to the CC&Rs, which were drafted in 1972 and in 1973 were recorded over the raw land that would be developed into the Koll Center. Koll Center Newport was the original declarant of the CC&Rs and the owner in fee of the property against which they were recorded. KCN is the successor property owner and successor declarant under the CC&Rs. We shall sometimes refer to Koll Center Newport or KCN as the Declarant.

Under section 11.02,[1] the CC&Rs may be amended with the written consent of the owners of 75 percent of the property subject to them. The CC&Rs have been amended several times, most recently in 1997, to grant the Declarant authority to permit specific parcel owners to use certain Common Parking Areas.

II.

GENERAL PROVISIONS OF THE CC&RS

Under the CC&Rs, the Koll Center was intended to be developed by conveyances of Parcels or Building Sites, with the Declarant (now KCN) retaining ownership in fee of property not so conveyed. Parcels and Building Sites are mutually exclusive; they have distinctive rights and obligations.

Parcels are existing lots or subdivided lots which must be conveyed in fee simple for development "as a single integrated unit." Parcels

---

[1] Undesignated section numbers are to the CC&Rs.

4

may be improved and used for any purpose permitted by the CC&Rs and the Development Standards. In contrast, Building Sites are not lots or subdivided lots but fall within Development Areas (ownership of which is retained by the Declarant) and may be conveyed in fee simple or by grant of an exclusive right to occupy. A Building Site may be improved only with a professional and/or business office building.

Parking rights and obligations are also different for Building Sites and Parcels. Building Site Owners must construct a Common Parking Area on their designated Development Area. All Building Site Owners and Occupants have reciprocal nonexclusive rights to use of all Common Parking Areas. In contrast, Owners and Occupants of Parcels are not entitled to use any Common Parking Areas except for driveways crossing Common Parking Areas. Maintenance costs for Common Parking Areas are allocated pro rata among Building Site Owners (section 9.04); each Parcel Owner pays all maintenance costs for parking areas constructed on that Owner's Parcel (section 9.07). Both Building Site Owners and Parcel Owners are entitled to nonexclusive use of all Common Areas. (§§ 1.03(d), 2.02, 2.03.)

III.

THE BUILDING AT 4910 BIRCH

A four-story glass and steel office building at 4910 Birch Street was one of the first buildings constructed at the Koll Center. The footprint of the office building constitutes a Building Site under the CC&Rs.

A 1974 grant deed from the Declarant to Koll Center Newport Number 4 (KCN-4) granted KCN-4 a fee interest in the Building Site at 4910 Birch Street along with an appurtenant nonexclusive parking easement "in perpetuity" in "all Common Parking Areas." The grant deed reserved to the Declarant the right "to relocate, remove, rebuild or otherwise alter all of said

5

Common Parking Areas so long as the aggregate total parking available within said Tract 8762 as an appurtenance to or for the benefit of all improvements from time to time constructed on said Tract is adequate to comply with . . . all applicable laws, rules, and regulations of the City of Newport Beach . . . and . . . the hereafter referenced CC&R's & Development Standards." This grant deed granted the Declarant "the power to relocate or alter such parking rights and easements so long as KCN-4 is not thereby deprived of access to its property or of parking adequate to meet the standards described."

In 1997, Olen purchased the Building Site at 4910 Birch Street (the Olen Building Site). The grant deed conveying the Olen Building Site to Olen includes the same language as in the KCN-4 grant deed, granting Olen an appurtenant easement in perpetuity over all Common Parking Areas.

When Olen purchased the Olen Building Site, it was next to, and bordered (in whole or in part) on three sides by, 6.216 acres of on-grade (i.e., surface level) Common Parking Area. Although the Development Area on which the Olen Building Site was located was never identified or described at trial,[2] it appears the 6.216 acres of Common Parking Area were located on that Development Area.

---

[2] Much to the trial court's consternation, nobody at trial was able to identify the Development Area on which the Olen Building Site is located or even describe how a Development Area is designated as such.

## IV.

### CREATION OF PARCEL 1 AND SALE TO SHOPOFF

In 2010, the City passed the "Airport Business Area Integrated Conceptual Development Plan" which allowed for development of residential buildings in the John Wayne Airport Area, including the Koll Center.

Thereafter, KCN applied for a lot line adjustment to create a separate, irregularly-shaped parcel out of the 6.216 acres of common area parking adjacent to the Olen Building Site. The new parcel was designated as Parcel 1.

In 2014, KCN entered into an agreement to sell Parcel 1 to Shopoff Land Fund II, L.P. (Shopoff). Shopoff purchased the land to build a 260-unit condominium development with three towers, some retail space, and a public park.

Olen brought a lawsuit to enjoin Shopoff's proposed development. The lawsuit was settled, with Olen agreeing residential development within the Koll Center was permissible without an amendment to the CC&Rs provided the City approved an amendment to the Development Standards to allow such development. Olen agreed not to oppose a petition to so amend the Development Standards.

## V.

### THE SALE TO TPG AND THE TPG PROJECT

The sale to Shopoff closed in 2018. Shopoff ultimately decided not to go forward with the condominium development and, in May 2019, entered into an agreement to sell Parcel 1 to TPG. TPG's purchase was subject to the condition that all necessary governmental entitlements be approved.[3]

---

[3] The purchase and sale agreement does not appear in the 60-volume Appellant's Appendix. A ninth amendment to the purchase and

TPG decided not to proceed with the development planned by Shopoff but instead proposed the TPG Project, which would include a five-story, single building, 312-unit apartment complex to be called the Residences at 4400 Von Karman. The TPG Project would abut the Olen Building, with an apartment building separated from the Olen Building by an irregularly-shaped public park. At its closest point, the proposed apartment building would come within 50 feet of the Olen Building Site. The TPG Project included a subterranean parking structure beneath the apartment complex and a freestanding four-level parking garage located in a different area of the Koll Center that would remain under KCN's ownership.

The TPG Project would eliminate 452 spaces from the Common Parking Area adjacent to the Olen Building Site and leave 182 on-grade (surface level) spaces. The subterranean parking structure would have 825 spaces, of which 273 were intended to replace the eliminated Common Parking Area spaces. The freestanding parking structure would have 294 parking spaces.

TPG thereafter applied to the City for an amendment to the Development Standards for the Koll Center and a development agreement with the City. The City Planning Commission Report dated November 5, 2020 included a draft construction management and control plan giving an estimated construction time of 140 weeks or 32.3 months.

In January 2021, the City approved TPG's application for amendments to the Development Standards and for a lot line adjustment. The amendments included a "Residential Overlay Zone . . . tailored for the [TPG] Project." The City's approval was subject to 104 conditions, including a

_____

sale agreement with a date of July 1, 2021 gives a sale price of $28 million.

dedication in fee to the City of 1.1 acres to be improved as a park. The City permitted removal of approximately 635 parking spaces provided they were replaced by 284 spaces within the proposed freestanding parking structure, 273 spaces within the residential subterranean parking structure, and 75 spaces within nearby surface parking lots.

VI.

THE DEVELOPMENT COOPERATION AGREEMENT

The sale to TPG closed on October 29, 2021. TPG thereby became a Parcel Owner within the Koll Center.

That same day, TPG and KCN entered into a Development Cooperation Agreement (the DCA) which required KCN to (1) assist TPG in obtaining approvals from the City and surrounding property owners, (2) "cooperate with TPG regarding KCN's architecture review procedures contemplated under the KCN CC&Rs," and (3) grant TPG construction easements over property owned by KCN, including Common Areas and Common Parking Areas.

The DCA does not purport to abrogate the CC&Rs. To the contrary, it stated: "KCN's cooperation and other obligations in this Agreement only apply and bind KCN to the extent those obligations are permitted by and are consistent and in accordance with the KCN CC&Rs, including without limitation, KCN's obligations as Declarant thereunder, and to the extent KCN's performance of those obligations do [*sic*] not violate the KCN CC&Rs." It reiterated: "[t]he Parties hereby agree to abide by the terms of the KCN CC&Rs in the performance of their obligations hereunder."

Section 7 of the DCA provides that TPG will assign the freestanding parking structure to KCN upon completion and that the parking structure thereafter would be deemed to be both a Common Area and a

Common Parking Area under the CC&Rs. Section 7 of the DCA also states that KCN and TPG "will work to negotiate and enter into" an agreement granting KCN a license to use the 273 spaces in the subterranean parking and to deem those spaces to be a Common Parking Area.

VII.

TPG SUBMISSIONS TO KCN FOR APPROVAL OF THE TPG PROJECT

A. *Provisions of the CC&Rs Governing Approval of Improvements*

The CC&Rs govern approval of improvements constructed at the Koll Center. Section 4.01 requires plans to be submitted and approved in "three sequential phases." The three phases are: (1) "Schematic Phase Submission and approval," (2) "Preliminary Phase Submission and approval," and (3) "Construction Documents Submission and approval." The final sentence of section 4.01 reads: "Submissions must be made in the order indicated and approval of each submission must be obtained from Declarant before a subsequent submission on the same project will be considered by Declarant."

Section 4.02 specifies the "submissions and information" required at each phase. The level of detail increases with each subsequent phase. At the third phase, the Construction Documents Phase, the applicant must submit: (1) "Complete working drawings in such detail as Declarant shall specify including site development plan and landscaping plan"; (2) "Specifications"; and (3) "Exterior colors and materials." (CC&Rs, § 4.02(c).)

Section 4.03 of the CC&Rs describes the appropriate bases for approving proposed improvements to the Koll Center. They include "the adequacy of the structural design of the proposed Improvements" and "the

10

conformity and harmony of the external design thereof with neighboring structures."

Section 4.06 requires that construction on improvements "be diligently prosecuted" but specifies, "[i]n any event, completion of construction or alteration of such Improvements shall be within two years after the commencement thereof."

B. *TPG's Submissions*

Scott Meserve, who handled the review process on behalf of KCN, testified that the plans for the TPG Project were so far along that the Schematic Phase and Preliminary Phase were considered "cumulative[ly]." No Schematic Phase documents were separately submitted; instead the plans were submitted "as preliminary and . . . reviewed . . . as such." When asked why KCN had considered approval of Phase II or Phase III plans without first approving Phase I, Meserve testified: "We're trying to be reasonable and not double up effort. They would have had to go backwards in time with plans to strip out detail to really make it just that, and it would have doubled up our efforts as well."

VIII.

KCN's FINAL APPROVAL OF THE TPG PROJECT

Meanwhile, on April 6, 2022, TPG submitted to KCN "The Picerne Group's Construction Phase submittal package for *The Residences at 4400 Von Karman.*" Separate packages were submitted for the residences and for the freestanding parking structure. On June 29, TPG made what it considered to be its final Phase III/Construction Documents Phase submittal to KCN, which we refer to as "TPG's final Submission." The most recent construction schedule, dated March 4, 2022, gave a total construction time of 43 months.

11

KCN granted final approval of the TPG Project's Construction Documents Phase in a letter dated July 1, 2022. In an email dated July 11, 2022, Meserve clarified "that approval includes approval of the Schematic Phase and the Preliminary Phase, and constitutes KCN A's final approval of those plans, specifications and renderings under Sections 4.01–4.04 of the CC&Rs."

PROCEDURAL HISTORY

Olen initiated this lawsuit in March 2021. Its third amended complaint asserted six causes of action. At issue in this appeal is Olen's third cause of action, for declaratory and injunctive relief, and Olen's first cause of action, which alleged that KCN and TPG breached the CC&Rs.

Olen sought to enjoin construction of the TPG Project on the ground that the project, and KCN's approval of it, violated a number of provisions of the CC&Rs. Olen also sought declaratory relief in support of its claims.

Trial was bifurcated. The first phase of trial was nearly a two-month bench trial on Olen's third cause of action for declaratory relief. (The second phase would be on Olen's causes of action seeking damages against KCN.) The trial court issued its final statement of decision in April 2023. We will address the trial court's findings in detail in the Discussion section, but in general the final statement of decision did the following:

The trial court recognized "this case turns on whether the [TPG] Project complies with the CC[&]Rs, which essentially amount to an agreement between KCN and the other owners of property in Koll Center Newport." The court found "[t]he CC[&]Rs reflect the original developer's intention over time to 'sell, lease, or otherwise convey or develop' the property within the Center."

12

The trial court concluded that KCN's approval of the TPG Project was not entitled to judicial deference pursuant to *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249 (*Lamden*) and, to the extent the approval was not in direct contravention of the CC&Rs, it was required to be "'just and reasonable.'" The trial court made these findings in favor of Olen: (1) KCN and TPG did not follow the sequential phase approval procedure of sections 4.01–4.04; (2) the documents submitted by TPG as part of phase III of the approval procedure of section 4.01 did not constitute "'complete working drawings'" as required by section 4.02(c); (3) the construction time estimate for the TPG Project exceeded the two-year limit on construction of improvements imposed by section 4.06; and (4) TPG and KCN had failed to "formally dedicate the 273 parking spaces in the subterranean parking to Common Parking Areas." But the trial court found in favor of KCN and TPG on several other issues, which we discuss below.

The trial court found three violations of CC&Rs: (1) KCN failed to follow the procedures of sections 4.01 and 4.04 in approving the TPG Project, (2) KCN approved the TPG Project knowing the estimated time to complete construction exceeded the two-year limit of section 4.06, and (3) KCN and TPG approved the TPG Project without securing TPG's agreement to "formally dedicate the 273 parking spaces in the subterranean parking to Common Parking Areas."

The trial court found violations one and three supported injunctive relief but violation two did not.

Accordingly, in May 2023, the trial court issued an injunction enjoining KCN and TPG from proceeding with construction of the TPG Project unless and until: "(1) TPG and KCN follow the CC&R approval process provided in Section 4.01–4.04 of the CC&Rs including, but not limited

13

to the submittal, review and approval of complete working drawings and KCN provides valid CC&R compliant approval of the TPG Project; and (2) KCN and TPG must comply with the Section 7.02 requirement that 'the total available parking in such Common Parking Area may not be reduced below that required by the Development Standards'. If the 273 replacement spaces within the TPG Parcel are meant to meet this requirement, then KCN and TPG shall enter into an enforceable agreement formally dedicating the 273 subterranean parking spaces as Common Parking Areas made available to all Koll Center Building Site Owners and their occupants and guests."

Olen timely appealed from the order granting the injunction. KCN and TPG also appealed. An order granting an injunction is directly appealable pursuant to Code of Civil Procedure section 904.1, subdivision (a)(6).

## DISCUSSION

## I.

### FIDUCIARY DUTY ISSUES

A. *The Trial Court Correctly Concluded KCN Owed Fiduciary Duties to Olen*

The trial court found KCN's decisions regarding the TPG Project, if in violation of the CC&Rs, were not entitled to judicial deference under *Lamden, supra*, 21 Cal.4th 249. Olen agrees with this conclusion but argues the court failed to shift the burden to KCN to prove its decisions were fair and reasonable. KCN argues it owed no fiduciary duties to Olen and its decisions were entitled to judicial deference. We conclude the trial court correctly found KCN's decisions were not entitled to deference and any misallocation of the burden of proof was harmless.

In *Lamden*, the California Supreme Court held: "[W]here a duly constituted community association board, upon reasonable investigation, in

14

good faith and with regard for the best interests of the community association and its members, exercises discretion within the scope of its authority under relevant statutes, covenants and restrictions to select among means for discharging an obligation to maintain and repair a development's common areas, courts should defer to the board's authority and presumed expertise." (*Lamden, supra*, 21 Cal.4th at p. 265.) The *Lamden* court concluded the trial court properly deferred to the board's decision to treat a termite infestation by spot treatment rather than fumigating. (*Id.* at p. 264–265.)

The standard of deference is different, however, when applied to decisions made by a developer and declarant of CC&Rs. The defendant in *Cohen v. S & S Construction Co.* (1983) 151 Cal.App.3d 941 (*Cohen*) was a developer that had written the CC&Rs governing a tract on which the plaintiff's home was located. (*Id.* at pp. 943, 945.) The defendant also assumed responsibility for enforcement of the CC&Rs by controlling both the homeowner association's board of directors and the procedures for approving landscape and fence plans. (*Id.* at p. 945.) The Court of Appeal concluded the developer owed a "basic fiduciary duty" to the homeowners' association "to act in good faith, exercise proper management, and avoid conflicts of interest" and that "'a developer . . . may not make decisions for the Association that benefit [its] own interest at the expense of the association and its members.'" (*Ibid.*; see *Raven's Cove Townhomes, Inc. v. Knuppe Development Co.* (1981) 114 Cal.App.3d 783, 787–788, 799 [developer serving as director of an association may not make decisions for the association from which it benefits at the expense of the association].)

KCN is the successor to the original declarant of the CC&Rs and controls the procedure for approving improvements at the Koll Center. KCN therefore owed fiduciary duties to owners of real property at the Koll Center

15

to act in good faith and avoid conflicts of interest. Even if acting in good faith, KCN could not make decisions that violate the CC&Rs. (*Ekstrom v. Marquesa at Monarch Beach Homeowners Assn.* (2008) 168 Cal.App.4th 1111, 1123.)

KCN argues it owed no fiduciary duties under the CC&Rs because the Koll Center has no homeowner association or board. KCN tries to distinguish *Cohen* and *Raven's Cove* on the ground the developers in those cases controlled the homeowner association and, in *Cohen*, approval of landscape and fence plans. That distinction makes no difference. The relevant factor is *control*. In *Cohen* and *Raven's Cove*, the developer exercised control through homeowner associations; here, KCN controls the approval process for improvements and, effectively serves the same function as a homeowners or property owners association.

KCN argues CC&Rs section 4.08 expressly provides that the Declarant is subject to a lower good faith actual knowledge standard and is not subject to a fiduciary standard. KCN first raised section 4.08 in its reply brief in support of its cross-appeal. The issue may therefore be deemed forfeited. (*Burton v. Campbell* (2024) 106 Cal.App.5th 953, 965-966; *United Grand Corp. v. Malibu Hillbillies, LLC* (2019) 36 Cal.App.5th 142, 158.)

But even if we were to consider KCN's argument on the merits, CC&Rs section 4.08 does not provide that Declarant's decisions are subject to a lower good faith and actual knowledge standard. Section 4.08 is a limitation on liability for damages, not a limitation on the Declarant's duties. It states, "Declarant shall not be liable for any damage, loss or prejudice suffered or claimed on account of (i) the approval or disapproval of any plans, drawings and specifications whether or not defective; (ii) the construction or performance of any work whether or not pursuant to approved plans,

16

drawings and specification; (iii) the development of any part of the Property; or (iv) the execution or filing of an Estoppel Certificate. . . ."

Section 4.08 does not purport to waive the Declarant's fiduciary duties, and any such waiver would appear to be unenforceable. (See *Neubauer v. Goldfarb* (2003) 108 Cal.App.4th 47, 57 [waiver of corporate directors' and majority shareholders' fiduciary duties to minority shareholders in private close corporations is against public policy].) In *Cohen v. Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642, 650, 655, the Court of Appeal concluded that exculpatory clauses in CC&Rs that were similar to section 4.08, were not enforceable. (See *Cohen v. S & S Construction Co.* (1983) 151 Cal.App.3d 941, 945 [exculpatory clauses in CC&Rs were not enforceable].)

Section 4.08 does not render the Declarant immune from injunctive or declaratory relief. Because Olen was not seeking damages in these proceedings, it is unnecessary to determine whether section 4.08 is enforceable and extends to Olen's claims.

The trial court agreed with Olen that KCN's approval of the TPG Project was not entitled to judicial deference, "[a]lthough the Court does not necessarily agree with Olen's precise formulation of the standard of review." Olen takes issue with the quoted passage because, Olen claims, its formulation of the standard of review was taken directly from *Coley v. Eskaton* (2020) 51 Cal.App.5th 943. We find no error, as later in the statement of decision, the court stated, "[f]or those actions or decisions that do not directly contravene a CC[&]R provision, they are required to be 'just and reasonable' *as articulated in Coley*. . . ."

17

B. *Any Error in Allocating the Burden of Proof Was Harmless*

Olen argues that in several instances (i.e., whenever the trial court ruled against it) the trial court misapplied the *Coley* standard by placing the initial burden of proof on it. Misallocation of the burden of proof in a bench trial is not reversible error per se and is deemed harmless if substantial evidence supports the trial court's express or implied findings. (*Navigators Specialty Ins. Co. v. Moorefield Construction, Inc.* (2016) 6 Cal.App.5th 1258, 1287; *Perez v. VAS S.p.A.* (2010) 188 Cal.App.4th 658, 679.) "[T]he question of the weight of evidence and the question of upon whom rests the burden of proof become purely academic when the trial court has found upon substantial evidence that the essential facts have been proved." (*Merrill v. Normandie Corp.* (1930) 110 Cal.App. 621, 623.)

This was not a case whose resolution hinged on the allocation of the burden of proof. All parties fully presented their evidence on all issues. Regardless of whether the burden of proof was misallocated at trial, appellate review of the trial court's findings is subject to the same substantial evidence standard applicable to any appeal from a judgment based on a statement of decision after a bench trial. (See *McPherson v. EF Intercultural Foundation, Inc.* (2020) 47 Cal.App.5th 243, 257.)

II.

PRINCIPLES GOVERNING INTERPRETATION OF CC&RS IN GENERAL
AND SPECIFICALLY THE CC&RS IN THIS CASE

"CC&R's are interpreted according to the usual rules for the interpretation of contracts generally, with a view toward enforcing the reasonable intent of the parties." (*Harvey v. The Landing Homeowners Assn.* (2008) 162 Cal.App.4th 809, 817 (*Harvey*).) "'Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is

formed governs interpretation.'" (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 763)

"The language of the CC&R[ ]s governs if it is clear and explicit, and we interpret the words in their ordinary and popular sense unless a contrary intent is shown. [Citations.] The parties' intent is to be ascertained from the writing alone if possible. [Citation.]" (*Harvey, supra,* 162 Cal.App.4th at p. 817; see Civ. Code, §§ 1638, 1639.)

TPG urges us to ignore these long-standing legal principles of contract interpretation because the Preamble to the CC&Rs states, "[i]t is assumed that the Owners and Occupants of portions of the Property will be motivated to preserve these qualities through mutual cooperation and by enforcing not only the letter but the spirit of this Declaration." Based on this aspirational statement of hoped-for cooperation among Owners and Occupants, TPG suggests we interpret the CC&Rs based on their "spirit," rather than their actual language. TPG cites no authority—and we are aware of none—that supports this request.

An appellate court independently interprets the CC&Rs unless the trial court's interpretation turns on the credibility of extrinsic evidence (*Harvey, supra,* 162 Cal.App.4th at p. 817) or the extrinsic evidence is in conflict (*Eith v. Ketelhut* (2018) 31 Cal.App.5th 1, 17). When extrinsic evidence is used to aid in contract interpretation, any reasonable construction will be upheld if it is supported by substantial evidence. (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 956 (*Founding Members*).)

## III.

### CC&Rs Article IV (Approval of Plans) Issues

These appeals raise a number of issues regarding Article IV of the CC&Rs, entitled "Approval of Plans." We address each separately below:

A. *Meaning of "Complete Working Drawings" in Section 4.02(c)*

1. Background

The first issue is whether the plans and specifications TPG submitted at Phase III of the approval process complied with the requirements of the CC&Rs. As explained above, sections 4.01 and 4.02 prescribe a three-phase procedure for approving construction plans at the Koll Center. To review: Phase I is "Schematic Phase Submission and approval," Phase II is "Preliminary Phase Submission and approval," and Phase III is "Construction Documents Submission and approval." Pursuant to section 4.02(c), TPG was required for Phase III to submit "Complete working drawings in such detail as Declarant shall specify including site development plan and landscaping plan."

The trial court found the term "'complete working drawings'" has a technical meaning in the building industry and that it means "construction-ready plans." Based on that interpretation, the court concluded KCN's approval of the Construction Document Phase was "flawed" because "it is undisputed that the submittals for this third phase . . . do not amount to true 'working drawings' per the testimony of virtually all of the witnesses who testified." We find no error.

2. Substantial Evidence Supports the Trial Court's Interpretation of "Complete Working Drawings"

The words of a contract used in their technical sense should be understood by their technical meaning. (Civ. Code, § 1644.) "Technical words

20

are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used in a different sense." (Civ. Code, § 1645.) Expert testimony is admissible to help construe the meaning of technical terms in a contract. (*Bailey v. Breetwor* (1962) 206 Cal.App.2d 287, 291; *Harrison v. Frye* (1957) 148 Cal.App.2d 626, 628.) The trier of fact resolves any conflict in testimony over the meaning of a technical term. (*Warner Construction Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285, 289.) We review a trial court's interpretation based on extrinsic evidence for substantial evidence. (*Founding Members, supra*, 109 Cal.App.4th at p. 956.)

We conclude substantial evidence supports the trial court's interpretation of the term "complete working drawings." Olen's expert civil engineer, Max Vahid, testified the term "working drawings" means "a set of plans and specifications that are complete, approved by the reviewing agency and ready for construction." He explained working drawings could be "hand[ed] . . . to the contractor to construct." TPG's owner Picerne testified at his deposition, the transcript of which was admitted into evidence at trial, that construction people refer to formal construction documents as "working drawings."

TPG's landscape architect, Matt Jackson, testified that construction documents can be a term used to mean "working drawings," and TPG's development expert, Geoffrey Le Plastrier, agreed that "working drawings would be enough for the contractor and the subcontractors to look at it and know exactly where everything is." KCN's managing principal, Gerald Yahr, testified in a declaration, admitted into evidence trial, that at Phase III the applicant must submit "final construction documents (which include complete working drawings, development plan, landscaping plan, and specifications)." Further, the description of Phase III as the *Construction*

21

*Documents* Submission and approval phase supports interpreting "complete working drawing" to mean construction-ready documents. (Italics added.)

To be sure, there was contrary testimony, but it was the trial court's province to resolve conflicts in the testimony, and, under the substantial evidence rule, we uphold findings supported by substantial evidence even if there is contradictory evidence. (*Dane Elec Corp., USA v. Bodokh* (2019) 35 Cal.App.5th 761, 770.)

Substantial evidence also supports the finding that TPG's Phase III submittal did not constitute complete working drawings. Vahid reviewed TPG's Phase III submittal and concluded it was incomplete and not construction-ready level. Picerne testified at his deposition that as of September 2022, when he was deposed, TPG had not begun to prepare working drawings for the TPG Project. Le Plastrier testified that TPG's June 29, 2022 submittal did not constitute complete working drawings. Jackson testified that TPG's submittal dated June 29, 2022 was "a partial working drawing" and was not "phase three."

We have considered all of the arguments offered by KCN and TPG to support a different construction and find none of them persuasive. For example, KCN argues the phrase "'drawings in such detail as Declarant shall specify'" in section 4.02(c) means the term "complete working drawings" must be read to mean "drawings containing all the detail specified by Declarant in its discretion." We disagree. The phrase "in such detail as Declarant shall specify" modifies the term "complete working drawings." Whatever discretion the Declarant might have to set the level of specificity, the documents submitted by the applicant at Phase III must at least constitute "complete working drawings." Substantial evidence supports the trial court's finding that TPG did not submit complete working drawings.

22

B. *CC&Rs Sections 4.01 and 4.02 (Sequential Procedure) Issues*

The second issue is whether KCN complied with the sequential, three-step procedure laid out in section 4.01 for approval of the proposed TPG Project. The trial court found it did not:

"By the time KCN approved the Construction Document Phase on July 1, 2022 (Exh. 46), it still had not provided final approval of the first two phases. Apparently realizing that the Construction Document Phase could not be approved (or, for that matter, even considered) before the earlier phases were approved, Meserve decided to address this problem by asserting in a July 11, 2022 email as follows: 'For clarity, that approval includes approval of the Schematic Phase and the Preliminary Phase, and constitutes KCN[ ]'s final approval of those plans, specifications and renderings under Sections 4.01–4.04 of the CC&Rs.' [Citation.] In a further effort to clean up the problem, Meserve claimed that KCN's lawyer was wrong to the extent that he stated the Schematic Phase [phase I] had not been given."

The trial court enjoined KCN and TPG from proceeding with construction of the TPG Project unless and until "TPG and KCN follow the CC&R approval process provided in Sections 4.01–4.04 of the CC&Rs including, but not limited to submittal, review and approval of complete working drawings and KCN provides valid CC&R compliant approval of the TPG Project."

KCN did not follow the procedure set forth in sections 4.01 and 4.02. KCN considered TPG's Preliminary Phase documents before approving TPG's Schematic Phase documents. Indeed, there is no evidence that TPG ever submitted Schematic Phase documents. KCN considered TPG's Construction Documents Phase submittal after having only conditionally approved TPG's Preliminary Phase submittal. However, we agree with the

23

trial court that such failure to comply with the first two phases of the approval procedure of section 4.01 was "more procedural than substantive." Olen was not harmed because KCN had before it all the information and documents necessary to satisfy the requirements of Phase I and Phase II when it approved TPG's Phase III submission. Accordingly, KCN's failure to follow the first two phases of the sequential procedure of section 4.01 was not a proper basis for enjoining the TPG Project. But, as we have concluded, KCN's failure to comply with Phase III by not requiring complete working drawings from TPG justified injunctive relief.

C. *CC&Rs Section 4.06 (Construction Time Estimate) Issues*

Section 4.06 of the CC&Rs requires that construction on improvements "be diligently prosecuted" but "[i]n any event, completion of construction or alteration of such Improvements shall be within two years after the commencement thereof" unless excepted under a force majeure clause. Section 4.06 also states, "[f]ailure to comply with the provisions of this Section shall constitute a breach of this Declaration and shall subject the defaulting party or parties to all of the enforcement procedures set forth in this Declaration and to any other remedies provided by law or equity."

The trial court found that KCN's approval of the TPG Project was contrary to this two-year time limit because "[i]t is undisputed that the TPG Project, including the parking structure and apartment building, is expected to take at least three years to complete." However, it declined to grant injunctive relief on this basis because it was yet unknown how long the project would actually take, and any excess construction time could be remedied through monetary damages. KCN argues the trial court erred by finding its approval of the TPG Project violated the two-year construction

24

time limit of section 4.06, and Olen argues the trial court erred by declining to grant injunctive relief for that violation.

Section 4.06 is clear and unambiguous on its face. Construction of an improvement which lasts more than two years, unless excepted by the force majeure clause, is a breach of the CC&Rs and subjects the breaching party or parties to the CC&Rs enforcement procedures and to any other remedies provided by law or equity.

Contrary to KCN's argument, the time estimate for construction is relevant to the Declarant's scope of review and approval under CC&Rs sections 4.01–4.03. The considerations expressly identified in section 4.03 are not exclusive: Section 4.06 states approval of plans and specifications shall "be based, *among other things,* on . . . ." (Italics added.) And the CC&Rs are clear that, absent a force majeure event, construction must be completed within two years of its commencement date. KCN claims it has no obligation or ability to even consider the two-year construction time limit because KCN has no control over construction once it commences. KCN does, however, have control over the approval process. We agree with the trial court that KCN's approval of a project with a construction estimate exceeding two years constituted a violation of the CC&Rs.

Olen contends the trial court, having found KCN's approval of the TPG Project with a construction completion estimate of more than two years violated CC&R section 4.06, erred by declining to enjoin the project on that ground. The grant or denial of an injunction rests within the trial court's discretion and is reviewed under the abuse of discretion standard. (*Salazar v. Eastin* (1995) 9 Cal.4th 836, 849–850.)

We find no abuse of discretion. The trial court declined to grant Olen injunctive relief based on the section 4.06 violation for two reasons.

25

First, the court found "it is conceivable that the construction schedule will be accelerated in light of this decision" and "[t]o enjoin an entire project because of an estimate seems excessive since it is possible that the violation can be avoided." Second, the court found: "[A]ssuming the TPG Project exceeds the two-year limitation, then any affected party may seek damages attributable to the ongoing construction. Unlike the violations of §§ 4.01-04 and 7.02 which are not amenable to damages, violations of § 4.06 presumably can be quantified in terms of reduced tenancy, lowered rents, disruption of business and other costs. Thus, as to this violation, the Court finds that there is an adequate remedy at law and that an injunction is not warranted."

Olen argues the trial court erred because when CC&R violations have been found, the hardship doctrine applies. The hardship doctrine is applied to cases of encroachment to determine whether to grant an injunction to enjoin a trespass caused by an encroachment. (*Hirshfield v. Schwartz* (2001) 91 Cal.App.4th 749, 758–759.) "[W]hen the defendant without privilege occupies the plaintiff's property, an injunction is granted to remove the encroachment." (*Brown Derby Hollywood Corp. v. Hatton* (1964) 61 Cal.2d 855, 858.)

The hardship doctrine does not apply to Olen's claim for injunctive relief based on the two-year construction deadline of section 4.06 for several reasons. First, there is no encroachment to enjoin. Because no part of the TPG Project has been built, no part of the TPG Project "overlaps or encroaches on adjoining land" and there is as of yet no "right of action for damages or for a mandatory injunction to compel removal." (12 Witkin, Summary of Cal. Law (11th ed. 2017) Real Property, § 390, p. 449.)

Second, Olen's claim for relief for violation of section 4.06 is not based on injury from the actual or threatened encroachment; it is based on

26

the notion that KCN's approval of the TPG Project will likely lead to construction lasting more than two years. It is injury from prolonged construction arising from breach of the CC&Rs, not injury from encroachment by the completed construction, that is the basis for Olen's claim for injunctive relief.

Olen's request for injunctive relief based on the two-year construction deadline of section 4.06 amounts to a request to prevent a future breach of the CC&Rs. Therefore, to obtain injunctive relief, Olen was required to show that money damages would not afford adequate relief or would be extremely difficult to ascertain. (Code Civ. Proc., § 526, subd. (a)(4), (5); Civ. Code, § 3422; *DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.* (2009) 176 Cal.App.4th 697, 721–722.) The trial court found that damages would be adequate and ascertainable. Those findings are sufficient to support denial of injunctive relief and are supported by substantial evidence.

D. *CC&Rs Section 4.03 (Harmoniousness) Issues*

The fourth issue raised under Article IV of the CC&Rs is whether the trial court erred in finding the TPG Project was "harmonious" with the rest of the Koll Center. We find no error.

CC&Rs section 4.03 provides that approval of plans for improvements shall be based, among other things, "on . . . the conformity and harmony of the external design thereof with neighboring structures." The trial court found: "The fact that KCN's approval of the [TPG] Project . . . was flawed does not preclude a finding that the Project is harmonious. The evidence establishes that KCN carefully reviewed the plans for both the Residences and the parking structure . . . and considered the various issues that Olen now contends support a finding of inharmoniousness. Those issues—i.e., the structures being built, the layout of the park, the space

27

between the buildings, the finishes being used—are not affected by the lack of construction-ready working drawings."

Olen argues that in making this finding the trial court erred by placing the burden of proof on it and deferring to KCN. We conclude, however, the trial court's findings on conformity and harmony correctly interpret the CC&Rs and are supported by substantial evidence. Any misallocation of the burden of proof was therefore harmless. (*Perez v. VAS S.p.A., supra*, 188 Cal.App.4th at p. 679.)

Substantial evidence was presented that the external design of the TPG Project conforms to and is harmonious with neighboring structures, including the Olen Building. A City Planning Commission resolution found the proposed TPG Project complied with the criteria of "[t]he efficient arrangement of structures on the site and the harmonious relationship of the structures to one another and to other adjacent developments; and whether the relationship is based on standards of good design." KCN considered this finding in making its determination of harmoniousness.

Meserve met with TPG representatives twice in June 2022 and discussed external design features of the apartment building to make it more attractive. He opined that TPG's Final Submission, showed "attractive architecture, high-end finishes . . . upgraded finishes, as well as what we thought was a timeless look" and was "attractive and a good addition to the Koll Center." Likewise, KCN's expert witness Dustin Read drew upon his expertise in the real estate business to opine that the TPG Project was harmonious with the surroundings. Le Plastrier also testified that the TPG Project is harmonious with the structures at the Koll Center.

28

CC&Rs Section 1.03(n) Issues Regarding Whether the TPG
Project Is a "Single Integrated Unit"

A  *The TPG Project Is a Single Integrated Unit*

CC&Rs section 1.03(n) defines Parcel as "a subdivided portion of the Property conveyed in fee simple absolute for development as *a single integrated unit*." (Italics added.) Olen argues the trial court erred by failing to make a finding that Parcel 1 was not compliant with section 1.03(n) because the TPG Project is not a single integrated unit. KCN and TPG contend "single integrated unit" is not a limitation on use but "merely describes what a Parcel is and how it is conveyed."

We disagree with KCN and TPG that the term "single integrated unit" merely describes what a Parcel is. "Single integrated unit" must be a restriction on development because the CC&Rs permit only Building Sites, Development Areas, Common Areas, and Parcels. If a Parcel Owner could develop a Parcel with something other than a "single integrated unit," the Parcel would lose its status as such and become a form unrecognized by the CC&Rs.

The only witness at trial who could provide any insight on what "single integrated unit" means was Syd Buck, who worked as an accountant for the Koll Company from 1973 through 1983. His testimony is of limited help. When asked whether it was intended that the Koll Center would be a master plan for developments as "a professional office business park, Buck answered: "Well, there are ancillary things. We had parcels, which could be set aside for a gas station."

We must turn to the dictionary for guidance in defining each word. (*Make UC a Good Neighbor v. Regents of University of California* (2024)

16 Cal.5th 43 [dictionary may be useful to define ordinary meanings of words].) "Single" as used in this context of section 1.03(n) would mean "consisting of or having only one part, feature, or portion as opposed to or contrasted with double or complex." (Webster's 3d New Internat. Dict., p. 2123, col. 3.) "Integrated" could mean "composed of separate parts united together to form a more complete, harmonious, or coordinated entity" or, more likely here, "operating economically as a single coordinated physically interconnected unit or system." (*Id.* at p. 1174, col. 1.) "Unit" could mean "a single thing or person or group that is a constituent and isolable member of some more inclusive whole." (*Id.* at p. 2500, col. 2.) In more common parlance, "unit" can mean just a single thing.

"Single integrated unit" could thus be defined to mean one development, each part of which is united together to create a coordinated entity. Under this definition, the residential apartment complex and subterranean parking on Parcel 1 constitutes a single integrated unit. The proposed apartment complex is a single building connected to and integrated with a subterranean parking structure. The apartment complex is entirely within Parcel 1. The freestanding parking structure would not be on Parcel 1. However, the issue presented by CC&Rs section 1.03(n) is not whether the TPG Project would be, as a whole, a single integrated unit, but whether Parcel 1 would be is developed as a single integrated unit upon completion of the TPG Project.

Olen argues the TPG Project on Parcel 1 is not a single integrated unit because "demolition, construction and development of the Project requires use of many acres outside of the 6-acres [*sic*] of the TPG Property." The apartment building and subterranean parking structure would be contained entirely within the six acres of Parcel 1. Whether

30

demolition and construction will require use of land outside of Parcel 1 may implicate other provisions of the CC&Rs, but it does not affect the characterization of the apartment building as a single integrated unit.

B. *The CC&Rs Do Not Permit KCN to Grant Nonexclusive Easements Other than Utility Easements*

Olen makes a related argument that Parcel 1 is noncompliant with the CC&Rs because KCN agreed in the DCA to grant TPG construction easements over Common Parking Areas. Under section 2.04 of the CC&Rs, the Declarant may grant nonexclusive easements "over such portions of the Property other than designated Building Sites at such location or locations as Declarant shall deem advisable" but only "for the construction, installation, maintenance, removal, replacement, operation and use of *utilities*." (§ 2.04, italics added.)

It is axiomatic that one cannot grant an easement over property one does not own. "A servitude can be created only by one who has a vested estate in the servient tenement." (Civ. Code, § 804; see *Pfeiffer v. Regents of the University of Cal.* (1887) 74 Cal. 156, 162.) Thus, for the Declarant to have the ability to grant easements over property in the Center it did not own (i.e., over land on which the Declarant did not have a vested estate), the CC&R's would have to give the Declarant that ability. In that regard, section 2.04, which is entitled "Grant of Easements," grants the Declarant the right to grant only nonexclusive utility easements.

In construing section 2.04, we use the interpretative canon *expressio unius est exclusio alterius*, by which the explicit mention of some things in a text may imply other matters not similarly addressed are excluded. (*Howard Jarvis Taxpayers Assn. v. Padilla* (2016) 62 Cal.4th 486, 514.) "Applied to specific grants of power, the canon may support ""an implied

31

negative; an implication that no other than the expressly granted power passes by the grant; that it is to be exercised only in the prescribed mode."'"" (*Ibid.*) The canon gives rise to that negative implication "when there is some reason to conclude an omission is the product of intentional design. [Citations.]" (*Ibid.*) Such reason might pertain when the expressed items are members of an associated group series (see *Barnhart v. Peabody Coal Co.* (2003) 537 U.S. 149, 168) or when a there is a "series of terms from which an omission bespeaks a negative implication" (*Chevron U. S. A. Inc. v. Echazabal* (2002) 536 U.S. 73, 81).

Section 2.04 grants the Declarant the power to grant only nonexclusive utility easements and mentions no other kinds of easements. By expressing only the Declarant's right to grant nonexclusive utility easements, section 2.04 gives rise to the negative implication other kinds of easements are excluded from the scope of the Declarant's authority. The CC&Rs could have been drafted to give the Declarant the right to grant other kinds of easements, such as construction easements, if that had been the drafter's intent. Section 2.04 would serve no purpose, and would conflict with Civil Code section 804, if notwithstanding its limitation to utility easements, the Declarant had the right to grant easements other than nonexclusive utility easements over property it did not own.

*Ranch at the Falls LLC v. O'Neal* (2019) 38 Cal.App.5th 155, supports our interpretation of section 2.04. In that case, the trial court found the plaintiff was entitled to an express easement and an equitable easement over all the private streets in a gated community, and its decision was binding on third party individual homeowners within that gated community. (*Id.* at pp. 159, 173.) The Court of Appeal concluded third party individual homeowners could not be bound unless the owners of the private streets were

parties to the litigation or the homeowner's association for the gated community had the authority from the CC&Rs to bind its members to the grant of an easement over streets owned by members. (*Ibid.*) Those CC&Rs stated, concerning "'Easements for the Benefit of the Project,' that '[t]he Association shall have, and shall have to further grant, nonexclusive rights, easements and licenses over that portion of each Lot designated as the Private Streets, to the extent necessary for trash pick-up, mail delivery, street light maintenance, median strip maintenance, or other similar services for the benefit of the Owners and the Project.'" (*Id.* at p. 173, fn. 16.) The Court of Appeal concluded that while those CC&Rs gave the HOA authority to grant nonexclusive easements over the private streets, "this was *only* to the extent necessary for maintenance, trash pickup and similar services." (*Id.* at p. 173.)

The CC&Rs therefore do not permit the construction easements authorized by the DCA and the draft easement conveyance attached to the DCA as exhibit C to the extent such easements are to be over property on which the Declarant does not have a vested estate. Section 2.04 does not preclude or limit the Declarant's power to create easements of any kind over property on which the Declarant has a vested estate. (See Civ. Code, § 804.)

V.

CC&Rs ARTICLE VII (PARKING) ISSUES

A. *Background*

The TPG Project included a subterranean parking structure beneath the apartment building and a separate, freestanding, four-level parking structure on land owned by KCN. The TPG Project would eliminate 452 on-grade spaces from the Common Parking Area adjoining the Olen Building and leave 182 such spaces. The freestanding parking structure

33

would have 294 spaces. The subterranean parking would have 825 spaces, with 273 spaces located one level below-grade.

In section 4.1 of the DCA, TPG agreed to assign the parking structure to KCN upon completion, and the parking would be deemed to be both a Common Area and Common Parking Area. In section 7 of the DCA, KCN and TPG agreed to "work to negotiate and enter into" an agreement granting KCN a license to use the 273 subterranean parking spaces and to deem those spaces to be a Common Parking Area.

The trial court found: (1) "Nothing in the CCRs precludes a parcel owner from dedicating part of its property to common parking use by others at Koll Center or from transferring ownership of the structure to KCN . . ."; (2) The CC&Rs grant KCN and TPG the right to eliminate, reconfigure, and relocate Common Parking Areas; and (3) the CC&Rs do not bar relocating surface level parking to either the four-level, freestanding parking structure or the subterranean parking structure.

The trial court also found that KCN and TPG violated CC&Rs section 7.02 because there was no agreement in place between KCN and TPG guaranteeing the right of Building Site Owners and occupants to use the 273 subterranean parking spaces. The court found: "Because section 7 of the [DCA] does not guarantee that the 273 subterranean spaces will qualify as Common Parking Areas, KCN has approved a project that violates the requirement in § 7.02 that the relocation of existing surface parking cannot reduce the amount of available parking in Common Parking Areas. The fact that the subterranean parking may be made available to all Building Site owners and their occupants and guests as if it were a Common Parking Area is not a substitute for the clear language in § 7.02."

The trial court therefore enjoined KCN and TPG from proceeding with construction of the TPG Project until these conditions were met: "KCN and TPG must comply with the Section 7.02 requirement that 'the total available parking in such Common Parking Area may not be reduced below that required by the Development Standards'. If the 273 replacement spaces within the TPG Parcel are meant to meet this requirement, then KCN and TPG shall enter into an enforceable agreement formally dedicating the 273 subterranean parking spaces as Common Parking Areas made available to all Koll Center Building Site Owners and their occupants and guests."

Olen argues the trial court did not go far enough in finding that KCN and TPG violated CC&Rs section 7.02. Olen contends: (1) the trial court erred by interpreting the consent requirement of section 7.02 as permitting the reconfiguration and relocation of Common Parking Areas without the consent of the Building Site Owner, which is Olen; (2) the court erred by interpreting section 7.02 as permitting the Declarant to eliminate a Common Parking Area by redesignating it as a Parcel; (3) the proposed replacement parking—the freestanding parking structure and the subterranean parking structure—is not "on-grade" parking; and (4) the proposed replacement parking does not comply with the relevant Development Standards. We address each contention in turn.

B. *Issues Regarding Consent and Agreement Under CC&Rs Section 7.02*

The first parking issue we deal with is whether KCN and TPG complied with the requirement that the Declarant and Owner of the Common Parking Areas reach an agreement to reconfigure and relocate the parking. CC&Rs section 7.02 states: "Declarant, with the consent and agreement of *any Owner of any Common Parking Area*, shall have the right to alter the configuration or location of any parking or driveways located in such

35

Common Parking Area provided that the total available parking in such Common Parking Area may not be reduced below that required by the Development Standards." (Italics added.) We refer to the quoted passage as the consent provision. The italicized phrase "any Owner of any Common Parking Area" is the focus of dispute.

The trial court concluded that "both the Declarant (KCN) and TPG, the owner of the Parcel on which the soon to be eliminated parking spaces are located, have consented to the relocation." Olen argues the trial court's interpretation is in error because "any Owner of any Common Parking Area" can only refer to a Building Site Owner. KCN argues that TPG is the "Owner of any Common Area" because Parcel 1, conveyed to TPG, included the Common Parking Area on the Olen Building's designated Development Area.

The word "Owner" in section 7.02 is initially capitalized, which means it is a defined term. Section 1.03(m) defines "Owner" to mean "the person or entity who [1] is the record owner of a Parcel or [2] is the owner or designee of a Building Site." This definition excludes the Declarant as an Owner under section 7.02. A Building Site Owner does not own a Common Parking Area. (§§ 1.03(c), 2.03.)[4] Parcel Owners cannot by definition own Common Parking Areas because they can only be on Development Areas. (§ 1.03(e).)

Given the choice between Building Site Owner and Parcel Owner, we believe the most reasonable interpretation of section 7.02 is that the term

_____

[4] Building Site Owners have reciprocal non-exclusive easements to use Common Parking Areas. It is a stretch to say Building Site Owners are "Owners" of Common Parking Areas because they have an easement, which is a nonpossessory interest land. (*Romero v. Shih* (2024) 15 Cal.5th 680, 692.)

"any Owner of any Common Parking Area" may include a Parcel Owner if, as here, a Common Parking Area was conveyed as part of a Development Area to a Parcel Owner. We reach this interpretation by considering what appears to be the purpose of the consent provision. The language of section 7.02 when considered with the language of the CC&Rs as a whole indicates their intent was to grant the Declarant leeway and flexibility to reconfigure and relocate parking facilities within Common Parking Areas while providing Building Site Owners protections against unreasonable elimination of available Common Parking Areas. Accordingly, section 7.02 grants the Declarant the right "to alter the configuration or location of any parking or driveways" in the Common Parking Areas but protects the rights of Building Site Owners by insuring "the total available parking in such Common Parking Area may not be reduced below that required by the Development Standards." The interests of the Building Site Owners are thereby protected without requiring their consent under section 7.02. The consent or agreement of the owner of the estate in the land on which the Common Parking is located makes sense because the reconfiguration and relocation would directly affect that owner's property rights and interfere with the owner's use and enjoyment of the property.

In subsection V.C. we conclude that Common Parking Areas can only be on Development Areas. But for purposes of the consent provision of section 7.02 only, "any Owner of any Common Parking Area" can mean a Parcel Owner in situations such as that presented by this case, in which Common Parking Areas were conveyed to a Parcel Owner. A Common Parking Area cannot be eliminated, however, by conveyance of a Development Area to a Parcel Owner: The Common Parking Area remains.

37

Although the Parcel is nonconforming, the Parcel Owner is nonetheless for purposes of section 7.02 the Owner of the Common Parking Area.

Olen argues the term "Owner of any Common Parking Areas" cannot mean the owner of the land on which Common Parking Areas are located because the owner of the Development Areas was, until the sale to Shopoff in 2018, the Declarant, and it makes no sense to require the Declarant to reach an agreement with itself. This issue can be reasonably resolved by interpreting "any Owner of any Common Parking Areas" in section 7.02 as meaning "an Owner, if any, of any Common Parking Areas."

The final sentence of section 2.03 states that Building Site Owners "shall be entitled to all rights granted herein to every other Owner of the Property." Olen argues section 2.03 thus grants to Building Site Owners the right to consent under section 7.02. Section 2.03 only refers to "rights," which would mean those things expressly called rights in the CC&Rs, such as "reciprocal non-exclusive rights to use all parking areas" (§ 7.02.) The CC&Rs do not use the word "right" to describe the consent described in section 7.02.

C. *Common Parking Areas Cannot Be Relocated*

Olen argues "[t]he court misinterpreted Section 7.02 as allowing the Declarant to eliminate the Common Parking Area designation from property developed by a Building Site Owner to serve its Building Site pursuant to Section 7.01 and transform that area into a Parcel which the Declarant could develop or sell for development to a new use." We agree that the Common Parking Area cannot be eliminated by conveying the Development Area on which the Common Parking Area is located as a Parcel. The Common Parking Area remains; the Parcel cannot and must be made a Development Area or the CC&S must be amended.

38

The trial court concluded that the CC&Rs and the Olen grant deed gave the Declarant the right to relocate Common Parking Areas. "Thus," the court found, "the elimination of a number of parking spaces immediately adjacent to [the Olen Building] is permissible."

The trial court misinterpreted the CC&Rs. Section 7.02 does not grant the Declarant the right to relocate Common Parking Areas. Section 7.02 grants the Declarant the right "to alter the configuration or location of any parking or driveways located *in* such Common Parking Area." (Italics added.) Admittedly, the grant deed to KCN purports to grant it the right "to *relocate, remove, rebuild* or otherwise alter all of said Common Parking Areas" (italics added) but the grant deed is subject to the CC&Rs, which run with the land. (§ 1.01 ["These covenants, conditions, restrictions and easements shall run with the Property"].) The CC&Rs permit reconfiguration or relocation of the parking only *in* Common Parking Areas.

Under the CC&Rs the Koll Center was intended to be developed by means of conveyances of Parcels or Building Sites, with the Declarant (now KCN) retaining ownership in fee of property not so conveyed. The CC&Rs permit the Declarant "to sell, lease or otherwise convey or develop the Property" and do not prohibit the Declarant from conveying portions of a Development Area as a Parcel. KCN conveyed a portion of a Development Area to Shopoff as Parcel 1, and Shopoff in turn conveyed Parcel 1 to TPG. But once conveyed as a Parcel, Parcel 1 no longer was or could be a Development Area. A Parcel and a Development Area are not the same, and neither can be both at the same time. Parcels are defined by and created pursuant to CC&Rs section 2.02; Development Areas are defined in CC&Rs section 1.03(g). Development Areas may be used for business and professional office uses only, while Parcels may be used for any purpose permitted by the

39

CC&Rs and the Development Standards. Common Parking Areas are defined as "portions of the various *Development Areas* upon which on-grade parking facilities . . . have been or will be constructed." (Italics added.) The proposed subterranean parking structure is beneath the apartment building, which is a residential use prohibited in Development Areas. Because the subterranean parking structure is on a Parcel, and not on a Development Area, it cannot be a Common Parking Area.[5]

In short: Either the subterranean parking structure is not a Common Parking Area or, it if is, then the property conveyed to Shopoff (and then to TPG) is not a Parcel, in which case residential development on it is not permitted under the CC&Rs.

Although the CC&Rs permit the Declarant to convey Development Areas and to relocate parking and driveways within Common Parking Areas, they do not permit the Declarant to relocate Common Parking Areas *out of* a Development Area and *onto* a Parcel. As such, the proposed subterranean parking structure does not comply with the CC&Rs and would not comply with them for so long as the subterranean parking remains on a Parcel.

The trial court found the DCA solved the problem with respect to the freestanding parking structure by designating it as both a Common Area and a Common Parking Area. The CC&Rs do not permit that solution. Common Areas and Common Parking Areas are mutually exclusive terms.

---

[5] KCN was certainly aware that Common Parking Areas had to be on Development Areas and could not be used by Parcel Owners. Amendments to the CC&Rs made in 1996 and 1997 granted the Declarant at that time authority to permit specific Parcel Owners to use certain Common Parking Areas.

Common Areas are maintained by the Declarant for the common use of all occupants of the Koll Center. (§ 1.03(m).) Common Parking Areas are maintained by Building Site Owners and may not be used by Owners and Occupants of Parcels. (§§ 2.02, 9.04.) Property cannot be open to use by Parcel Owners and, at the same time, not be open to use by Parcel Owners.

A Parcel Owner may designate a portion of a Parcel as a Common Area. (§ 6.01.) That makes sense because Common Areas are not defined as being on Development Areas and are available for use by all Occupants of the Koll Center. It does not make sense, however, to permit a portion of a Parcel to be designated as a Common Parking Area unless that portion is severed from the Parcel and designated a Development Area.

Further, as we have explained, Olen has, by virtue of the CC&Rs and Olen's grant deed, an appurtenant nonexclusive reciprocal *easement* to Common Parking Areas. The proposal in the DCA to grant Olen and other Building Site Owners only a license to use the subterranean parking is insufficient and would abrogate Olen's rights under the CC&Rs and the grant deed to Olen. (See 6 Miller & Starr, Cal. Real Estate, *supra*, § 15:2, pp. 8–15 [distinguishing a license from an easement].)

D. *A Common Parking Area Requires "On-grade" Parking*

The TPG Project includes 273 subterranean parking spots beneath the apartment building and a separate free-standing, four-story parking structure intended as replacement for the elimination of 452 on-grade spaces in the Common Parking Area next to the Olen Building. Olen argues this proposed replacement parking does not comply with CC&Rs section 7.02 because that parking would not be "on-grade." We agree.

CC&Rs section 1.03(e) defines Common Parking Areas as "portions of the various Development Areas upon which *on-grade* parking

41

facilities . . . have been or will be constructed." (Italics added.) "[O]n-grade" means on the surface of the land, not in a structure or in a subterranean parking garage. The clear and unambiguous import of sections 7.02 and 1.03(e) is that Common Parking Areas cannot include parking facilities that are not on-grade.

The trial court concluded the CC&Rs do not prohibit the construction of parking structures or "require all future parking be at surface level." The trial court also concluded that CC&Rs section 7.02, by permitting alteration of parking "configuration," "encompasses replacing surface parking with a structure." The CC&Rs are unambiguous on their face: By defining Common Parking Areas as Development Areas on which "*on-grade* parking facilities . . . have been *or will be* constructed" (italics added), the CC&Rs require present and future Common Parking Areas to be on-grade. If a parking facility is not on-grade, it is by definition not a Common Parking Area.

Syd Buck testified that Don Koll intended ultimately to replace the on-grade parking with parking garages and buildings. Buck testified "Don always said, someday [¶] . . . [¶] we're going to be able to develop those surface parking areas. And he had the vision of creating parking garages and more buildings, whatever kind." The trial court overruled a hearsay objection to Buck's testimony on the ground it "is not being accepted for the truth of the matter, but it is accepted for [Buck's] basis of understanding the intent."

The trial court should have sustained the objection. Buck was not involved in drafting the CC&Rs, so he has no personal knowledge to offer regarding what the drafters intended the on-grade requirement to mean. He was purporting to recite out-of-court statements by Koll for their truth: that Koll always said he wanted to move parking into parking structures to make

42

room for more buildings. It is not clear that Koll expressed this intent at the time the CC&Rs were created back in 1972. But it doesn't matter: Buck's testimony is still hearsay. (Evid. Code, § 1200.) Under the objective theory of contracts, Koll's subjective, undisclosed intent or understanding is irrelevant (*Founding Members, supra*, 109 Cal.App.4th at p. 956). Further, the CC&Rs are not reasonably susceptible to the interpretation testified to by Buck.

KCN and TPG place great stock in the phrase "parking facilities" as including parking structures. Facility has several dictionary definitions; relevant here would be "something that promotes the ease of any action, operation, transaction, or course of conduct" and "something (as a hospital, machinery, plumbing) that is built, constructed, installed, or established to perform some particular function or to serve or facilitate some particular end." (Webster's 3d New Internat. Dict. (2002) pp. 812, col. 3 – 813, col. 1.) A freestanding parking structure would fit within either of those definitions—but so would a surface-level parking lot.

The phrase "parking facilities" in section 1.03(e) is modified by the word "on-grade." The word "on-grade" serves as a restriction on the phrase "parking facilities" and limits that phrase to surface level parking lots. The term "on-grade" cannot mean "not on-grade" too.

KCN and TPG argue interpreting "on-grade parking facilities" to exclude parking structures "dooms the Koll Center to surface parking obsolescence" and would stifle development. We can only interpret the CC&Rs, not rewrite them, and section 1.03(e) expressly and unambiguously defines Common Parking Area as "*on-grade* parking facilities." KCN and its predecessor Declarants have had decades to amend the CC&Rs to permit Common Parking Areas to include parking structures and other forms of above or below grade parking facilities. They never did so.

43

KCN argues the existence of other multi-story parking structures at the Koll Center demonstrates that Common Parking Areas are not limited to on-grade parking. The trial court found that "other freestanding parking structures utilized as Common Parking Areas already exist within the Koll Center." But no evidence was presented to show whether those parking structures were on Parcels or Development Areas, and Meserve testified he did not know.

E. *Issues Regarding Sufficiency of Replacement Parking*

Olen argues the proposed replacement parking (subterranean parking and a freestanding parking structure) does not comply with the Development Standards because the replacement parking (1) would reduce the amount of total available parking below that required by the Development Standards and (2) would not be appurtenant to and contiguous with the Olen Building Site.

Section 7.02 of the CC&Rs states the Declarant may reconfigure or relocate parking in Common Parking Areas "provided that the total available parking in such Common Parking Area may not be reduced below that required by the Development Standards."

For business and professional offices, the Development Standards set a minimum requirement of one parking space for each 225 square feet of net floor area. The Development Standards carve out an exception to this requirement for "parking pools." This exception provides, "[t]he parking requirements for office buildings within a contiguous office site may be modified in accordance with the following schedule when the net building areas served exceeds 100,000 square feet." The office sites are identified in the Development Standards as Building Sites A through B. The Olen Building Site is on Site B.

44

Olen argues the parking pool exception would not apply after completion of the TPG Project because the public park and the apartment building would render Site B noncontiguous by "physically and legally severing Site B along its central spine driveway." KCN argues Site B would remain contiguous because it would not be divided or separated "by public streets or other property not within the outline of the office site."

The Development Standards, as far as we can tell, do not define "a contiguous office site." Contiguous can mean different things depending on purpose and context. "Contiguous" can mean "touching along boundaries" or "next or adjoining with nothing similar intervening." (Webster's 3d New Internat. Dict. (2002) p. 492, col. 3.) Black's Law Dictionary defines contiguous as "[T]ouching at a point or along a boundary." (Black's Law Dict. (11th ed. 2019) p. 399, col. 1.) Contiguous can also mean "continuous, unbroken, uninterrupted: touching or connected throughout." (Webster's 3d New Internat. Dict. (2002) p. 492, col. 3.) The distinction between those meanings is shown by the phrase, "the lower 48 states are contiguous, but not contiguous with Alaska."

The Development Standards in this instance do not use the phrase "contiguous with" or "contiguous to" other property. The most logical definition of contiguous as used in "a contiguous office site" therefore is continuous, unbroken, uninterrupted. Site B is contiguous, and therefore subject to the parking pool exception, because it is a continuous, unified whole that is not broken, interrupted or divided by land which is not part of the site. Put another way, a single, unbroken line can be drawn around the boundary of Site B.

45

Testimony was presented at trial that the total building net floor area for Site B was 963,321 square feet. The applicable pooled parking requirement is tiered at one parking space per 250 to 350 square feet, which results in a total number of spaces required for Site B of 3,038. The current number of parking spaces in Site B is 3,197. The number would stay the same after the TPG Project is completed.

The Development Standards also use the term "Footprint Lot," defined as: "The area of land required for the building pad, encompassing the peripheral area of the building. Appurtenant and *contiguous to the footprint lot shall be all parking*, landscape, setbacks and other areas *as described and required by this text*." (Italics added.) Testimony was presented at trial that a "Footprint Lot" as used in the Development Standards is equivalent to a Building Site under the CC&Rs.

With respect to the term Footprint Lot, contiguous would mean "touching along boundaries" or "next to or adjoining" because the phrase "contiguous *to"* is used. The proposed freestanding parking structure would not be contiguous to the Olen Building Site. The freestanding parking structure would not touch along boundaries with, be next to, or adjoin the Olen Building Site but would be separated from it by the proposed apartment building. The subterranean parking also would not be contiguous to the Olen Building Site because the two would be separated by the one-acre public park required by the City.

Even if the subterranean parking is contiguous to the Olen Building, the TPG Project would not yield enough parking spaces to comply with the Development Standards. Meserve testified that after the TPG Project is completed, there would be 455 office parking spaces (182 surface spaces and 273 subterranean spaces) in the immediate vicinity of the Olen

46

Building Site and the two other Building Sites to the west of the apartment building. Meserve testified that the Olen Building and the two other office buildings have a combined net floor area of 127,738 square feet. After completion of the TPG Project, the parking ratio for those three buildings will be 3.56, which exceeds the ratio of 3.16 imposed by the Development Standards for Site B.

However, if the Olen Building Site and the other two other Building Sites west of the TPG Project are considered separately from the rest of Site B, the parking pool requirements are different. The Development Standards require one space per 250 square feet of net floor area for the first 125,000 square feet and one space per 300 square feet of net floor area for the next 300,000 square feet. Under those requirements, 509 spaces would be necessary to satisfy the Development Standards.[6]

Do we consider the parking requirements for the entirety of Site B or the parking requirements if the Olen Building Site and the two other office buildings west of the proposed apartment building were considered separately? It is the latter. The Development Standards require all parking for footprint lots (and hence Building Sites) be "contiguous." The TPG Project would render parking in Site B to be noncontiguous except for the parking west of the apartment building.

Thus, under the TPG Project, if the 273 assigned spaces in the subterranean parking structure were a Common Parking Area, the number of parking spaces in and around the Olen Building still would not comply with the Development Standards.

---

[6] 125,000 square feet divided by 250 = 500; 2,738 square feet divided by 300 = 9. 500 + 9 = 509

## VI.

### DEPRECIATION IN VALUE ISSUE

CC&Rs section 1.02 states that among the purposes of the restrictions is "to protect each Owner of any portion of the Property against improper development and use of other portions of the Property which will depreciate the value of such Owner's portion." Olen argues the trial court misinterpreted this provision and erred by allowing KCN's valuation witness to testify that the TPG Project might enhance the value of the Olen Building.

The trial court interpreted section 1.02 to mean "to the extent that a proposed development is not 'improper,' this provision would not necessarily bar the development even if it had a negative effect on the value of an Owner's property" and "the provision does not mean that potential temporary loss of value caused by construction disruption is enough to block a project."

We agree with the trial court's interpretation. By its plain terms, section 1.02 provides that a purpose of the CC&Rs is to protect an owner from "*improper* development and use" that "will depreciate the value" of the owner's property. (Italics added.) If development or use is "proper," the purpose protected by this passage from section 1.02 is inapplicable. Although the CC&Rs do not define the phrase "improper development," based on the plain meaning of the words, a reasonable interpretation is a development project that was not permitted by the CC&Rs, not approved in compliance with the procedures set forth in the CC&Rs, or does not comply with governing laws, rules, and regulations, such as zoning.

48

At this point, the TPG Project has not been approved or built. The injunction and this opinion impose conditions which must be met before the project can be approved. As such, the TPG Project is neither improper nor a development.

VII.

TPG'S APPEAL

In addition to challenging the issuance of the injunction, TPG contends substantial evidence does not support either the trial court's statements that TPG "pressured" KCN to approve the TPG Project or its conclusion that TPG breached the CC&Rs.

A. *Substantial Evidence Supports the Finding that TPG Pressured KCN*

The trial court's statement of decision states that by early 2022, "TPG began to apply pressure to ensure a quick approval" of the TPG Project, TPG threatened to sue KCN "if [it] did not immediately approve the Project," TPG engaged in "ongoing efforts to pressure KCN to approve the Project," and "TPG's pressuring of KCN succeeded." Although the court did not find TPG's pressure tactics or threats to be wrongful and did not find any legal consequences or liability resulted from them, TPG asks us to reverse these findings.

A series of communications between TPG and KCN representatives and internally within TPG provides substantial evidence that TPG pressured and threatened KCN. Picerne's March 1, 2022 letter to KCN's Yahr claimed KCN's approval was only a "ministerial" act, insisted KCN must "move very quickly" to approve the TPG Project, and said KCN's failure to do so would "expose TPG to further potential damages." Yahr testified he interpreted the letter as "a pressure tactic" to approve the TPG Project. A May 17, 2022 letter from TPG's attorneys told KCN if it did not approve the

49

TPG Project by September 26, 2022, "[KCN] will most definitely face a new lawsuit from TPG." Later, Picerne even boasted that "[KCN's] cooperation [in approving the project] is entirely based on the fact that we successfully cornered them" and "[t]hey became convinced that we would sue and that we would prevail." The record clearly supports the trial court's statements about TPG's successful pressure tactics and threats.

TPG argues the trial court erred by relying on those communications because they were protected by the litigation and common interest privileges of Civil Code section 47, subdivisions (b) and (c). The trial court did not rely on TPG's communications as a basis either for concluding TPG breached the CC&Rs or for issuing the injunction. If TPG's communications were protected by one or both of those privileges, the consequence would be that TPG would not be liable for making them. The litigation privilege and the common interest privilege confer immunity from liability. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 322 [litigation privilege confers immunity from all tort causes of action except malicious prosecution]; (*Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1196 [common interest privilege confers immunity from liability from defamation for making the privileged statement]; *Vivian v. Labrucherie* (2013) 214 Cal.App.4th 267, 276–278 [In narrow circumstances, litigation privilege confers immunity for breach of contract].) Trial was only on Olen's cause of action for declaratory relief; no damages were sought.

B. *The Trial Court Correctly Found TPG Breached the CC&Rs*

TPG argues the trial court erred by finding that TPG breached the CC&Rs by failing to formally dedicate the 273 parking spaces in the subterranean parking to the Common Parking Area.[7]

The trial court found TPG and KCN had breached the CC&Rs by failing "to formally dedicate the 273 parking spaces in the subterranean parking to Common Parking Areas."

TPG argues the evidence does not support this finding because "witnesses for both TPG and KCN testified they *intended* to" comply with the DCA's mandate that they ""work to negotiate and enter into" an agreement that among other things, w[ould] result in [the 273 subterranean spaces] being considered "additional 'Common Parking Areas' under the KCN CC&Rs."" TPG asserts the DCA imposed no deadline for reaching an agreement and the court should not have faulted KCN and TPG for going forward with approval of the TPG Project before ensuring the agreement was in place.

DCA section 7 provides: "Promptly following the Entitlement Challenge Resolution Date, KCN and TPG will work to negotiate and enter into a Podium Parking License, Maintenance and Operations Agreement (the '**Podium License**') with respect to the podium parking structure (the

_____

[7] Olen incorrectly suggests the court found three CC&R breaches *by TPG*. It did not. The court found: "Based on the above analysis, the Court finds three violations of the CCRs: (1) the failure of *KCN* to adhere to §§ 4.01 -04 in approving the TPG Project, (2) *KCN*'s approval of the TPG Project knowing full well that the construction of the Project—which includes both the parking structure and the Residences—will take more than the two-year limit in § 4.06, and (3) the failure of *TPG and KCN* to formally dedicate the 273 parking spaces in the subterranean parking to Common Parking Areas." (Italics added.)

'***Podium Parking***') to be constructed on the TPG Property, pursuant to which TPG will grant a license to the applicable parties under the KCN CC&Rs (consistent with the rights of use granted with respect to parking facilities under Article VII of the KCN CC&Rs) for the use of the KCN Parking Areas (as defined below) as additional 'Common Parking Areas' under the KCN CC&Rs. The license will permit exclusive use of the designated parking area(s) required under the Entitlement Approvals, and non-exclusive use for ingress and egress over the correlative driveways, walkways, elevators, stairwells and other means of ingress and egress." (We understand the term "Podium Parking" to refer to the 273 parking spaces in the subterranean parking structure that are intended to replace Common Area Parking spaces eliminated by the TPG Project.)

There are several flaws in TPG's argument that it did not breach the CC&Rs. First, the DCA only obligates the parties to *work* to negotiate and reach an agreement; it does not require them reach an agreement. As far as we can tell, there are no consequences under the DCA if KCN and TPG tried, but failed, to come to an agreement about the subterranean parking.

Second, the DCA requires the parties to try to negotiate only a *license* for Building Site Owners to use the subterranean parking. A license is not enough to comply with the CC&Rs. As explained above, Building Site Owners have an *easement* to use Common Parking Areas. Common Parking Areas must be on a Development Area, cannot be on a Parcel, and may not be used by Parcel Owners. That means, to comply with the CC&Rs KCN and TPG would have to reach agreement to designate the subterranean parking, and any parking intended to replace eliminated Common Parking Areas, as a Development Area only (not a Parcel or Common Area), thereby making the

52

subterranean parking a Common Parking Area subject to the Building Site Owners' easement and off limits to Parcel Owners, such as TPG.

Third, there was indeed a timeframe for reaching agreement under the DCA: it was the date of approval of the TPG Project. When KCN approved the TPG Project, no agreement was in place to create or require Common Parking Areas to replace the Common Parking Area that was to be eliminated. All that was in place was a bare agreement to negotiate in the future to try to reach an agreement that would not in any event satisfy the requirements of the CC&Rs. Without such an agreement in place at the time KCN approved the TPG Project, the TPG Project was not in compliance with the CC&Rs.

Finally, the DCA provides the freestanding, four-story parking structure will be both a Common Area and a Common Parking Area. The CC&Rs do not permit that result. A Common Parking Area and Common Area have contrary definitions under the CC&Rs; the parking structure cannot be both.

VIII.

ORDER SUSTAINING TPG'S DEMURRER
WITHOUT LEAVE TO AMEND

The first cause of action of Olen's third amended complaint asserted a cause of action against KCN and TPG for breach of the CC&Rs. In July 2022, the trial court sustained without leave to amend TPG's demurrer to that cause of action. Olen argues that in light of the trial court's findings in the statement of decision that TPG breached the CC&Rs, the court erred in sustaining TPG's demurrer without leave to amend.

In sustaining TPG's demurrer to the third amended complaint, the trial court concluded the first cause of action did not allege that TPG "has

53

done *anything* other than plan a project." The court stated: "To be clear, the Project ultimately may be found to violate the CC&Rs . . . . But those issues will be decided in the upcoming trial on Olen's declaratory relief claim, which is not at issue on this demurrer. As the Court previously observed, assuming the Project violates the CC&Rs, the party that breached the CC&Rs at *this point* isn't TPG, but KCN, which has the duty under the CC&Rs to approve or disapprove the Project. Nothing in the CC&Rs bars TPG from asking KCN to approve a construction project. Indeed, the Court doesn't see how *asking permission* to build even the most outlandish project violates the CC&Rs."

In the trial on Olen's declaratory relief cause of action, the trial court found that TPG breached the CC&Rs by failing "to formally dedicate the 273 parking spaces in the subterranean parking to Common Parking Areas." Because we are affirming that finding, Olen's first cause of action against TPG should be reinstated and Olen should be permitted to amend to allege that breach.

IX.

CONCLUSIONS

With respect to issues pertinent to the injunction and/or for which Olen sought declaratory relief, we reach the following conclusions:

1. The term "complete working drawings" in CC&Rs section 4.02(c) means final construction documents or construction-ready documents.

2. TPG and KCN failed to comply with the three-step submission and approval procedure, but the trial court did not abuse its discretion by declining to issue an injunction on this ground.

3. TPG did not submit to KCN complete working drawings for the TPG Project pursuant to section 4.02(c) of the CC&Rs and therefore has not satisfied the requirements of the Construction Documents Phase.

54

4. KCN's approval of the TPG Project was not in compliance with the CC&Rs because TPG did not submit complete working drawings for the TPG Project pursuant to section 4.02(c).

5. In approving the TPG Project, KCN violated the CC&Rs by approving a project with a construction time estimate that exceeded the two-year maximum set forth in CC&Rs section 4.06. The trial court did not, however, abuse its discretion by declining to grant Olen injunctive relief on that ground.

6. Substantial evidence supported the trial court's finding that the TPG Project was "harmonious" with the rest of the Koll Center.

7. The TPG Project would not render Parcel 1 noncompliant with the requirement of CC&Rs section 1.03(n) that a Parcel be developed as a single integrated unit.

8. CC&Rs section 2.04 authorizes the Declarant, so long as Declarant "owns any portion of or interest in those portions of the Property designated as Professional and Business Office Areas," to grant only nonexclusive easements "for the construction, installation, maintenance, removal, replacement, operation and use of utilities." The CC&Rs do not authorize the Declarant to grant any other types of easements over property for which the Declarant does not have a vested estate. Section 2.04 does not impair or limit the Declarant's ability to grant easements over property at the Center for which the Declarant does have a vested estate. The construction easement agreed upon in the DCA is not a utility easement and therefore is not permitted by the CC&Rs to the extent the easement is over property for which the Declarant does not have a vested estate.

9. The trial court correctly interpreted CC&Rs section 1.02 to mean "to the extent that a proposed development is not 'improper,' this

55

provision would not necessarily bar the development even if it had a negative effect on the value of an Owner's property" and "the provision does not mean that potential temporary loss of value caused by construction disruption is enough to block a project."

10. Under the CC&Rs, Common Parking Areas must be on Development Areas and may not be on Parcels. Property at the Center cannot be both a Development Area and a Parcel.

11. The CC&Rs grant the Declarant the right to alter the configuration or location of any parking or driveways located in a Common Parking Area. The CC&Rs do not permit the relocation of a Common Parking Area from a Development Area to a Parcel.

12. The CC&Rs grant Building Site Owners an appurtenant nonexclusive easement to Common Parking Areas, and, in addition, Olen's grant deed grants Olen an appurtenant nonexclusive easement to Common Parking Areas. The provision in the DCA that TPG and KCN would negotiate to enter into an agreement granting Olen and other Building Site Owners a license to use the subterranean parking does not comply with the CC&Rs and Olen's grant deed because a license is not the same as an easement.

13. At the time KCN approved the TPG Project, KCN and TPG had not reached an agreement to establish Common Parking Areas to replace Common Parking Areas that would be lost due to the TPG Project. That was a violation of the CC&Rs.

14. In section 7.02 of the CC&Rs, the term "any Owner of any Common Parking Area" can mean a Parcel Owner if a Common Parking Area has been conveyed as part of a Parcel to the Parcel Owner.

15. Property at the Center cannot be both a Common Area and a Common Parking Area. Common Areas and Common Parking Areas, as

56

defined in the CC&Rs, are mutually exclusive. The provision in the DCA designating the freestanding parking structure proposed by the TPG Project as both a Common Area and a Common Parking Area is therefore in violation of, and not permitted by, the CC&Rs.

16. Common Parking Areas must be on-grade, meaning at ground level. The subterranean parking and the freestanding parking structure proposed by the TPG Project are not on-grade and therefore do not comply with CC&Rs section 1.03(e).

17. The subterranean parking and the freestanding parking structure proposed by the TPG Project are not contiguous to the Olen Building and therefore do not comply with the requirement of the Development Standards that all required parking be "[a]ppurtenant and contiguous to the footprint lot."

18. Even if the subterranean parking could be deemed to be contiguous to the Olen Building, the TPG Project would not yield enough available parking to satisfy the requirements of the Development Standards. To determine whether the TPG Project complies with the Development Standards requirements for available parking, the Olen Building and the two Building Sites west of the Olen Building must be considered separately from the rest of Site B (as identified in the Development Standards). Testimony showed those three Building Sites have a combined net floor area of 127,738 square feet which, under Part III.B of the Development Standards, would require a minimum of 509 parking spaces.

## DISPOSITION

The order finding TPG to have breached the CC&Rs is affirmed. The order sustaining TPG's demurrer to the first cause of action of Olen's third amended complaint without leave to amend is reversed and the matter is remanded to grant Olen leave to amend to assert the breaches of CC&Rs identified in this opinion. The injunction is affirmed in part and reversed in part. The matter is remanded with directions to the trial court to modify the injunction to reflect and incorporate our conclusions reached in subsection IX of the Discussion section. Appellant Olen may recover costs on appeal.


SANCHEZ, J.

WE CONCUR:


MOTOIKE, ACTING P.J.


GOODING, J.